**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PHILLIP WAYNE GREEN,

*Defendant-Appellant.*

No. 08-4088

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

COURTNEY OMAR BOYD, a/k/a
Omar,

*Defendant-Appellant.*

No. 08-4090

Appeals from the United States District Court
for the Eastern District of Virginia, at Newport News.
Walter D. Kelley, Jr., District Judge.
(4:06-cr-00005-WDK-FBS-7; 4:06-cr-00005-WDK-FBS-3)

Argued: October 29, 2009

Decided: April 5, 2010

Before TRAXLER, Chief Judge, and GREGORY and
DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the majority opinion, in which Chief Judge Traxler joined. Judge Gregory wrote a separate opinion dissenting in part.

---

**COUNSEL**

**ARGUED**: Marcia G. Shein, LAW OFFICE OF MARCIA G. SHEIN, PC, Decatur, Georgia; Lawrence Hunter Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellants. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, Acting United States Attorney, Alexandria, Virginia; Eric M. Hurt, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

Appellant Courtney Omar Boyd ("Boyd") was convicted by a jury in the Eastern District of Virginia on two counts of a multi-count indictment: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and more than five grams of crack cocaine, in violation of 21 U.S.C. § 846, and (2) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Appellant Phillip Wayne Green ("Green" or "Appellant Green") was convicted on the drug conspiracy count described above after a joint trial with Boyd. In these consolidated appeals from final judgments of sentence, Boyd challenges numerous rulings of the district court, including but not limited to its denial of his motion for judgment of acquittal and its denial of his pretrial motion to suppress evidence. Appellant Green limits his

appellate challenge to a contention that the district court erred when it denied his motion for judgment of acquittal. For the reasons set forth within, we find no merit in the Appellants' contentions. Accordingly, we affirm.

I.

This prosecution arose from a largely family-based, years-long drug distribution network in which members of the conspiracy transported multi-kilogram quantities of cocaine by automobile from South Florida to the Tidewater Region of Virginia. On January 11, 2006, a grand jury returned a 16-count indictment against seven individuals: Fitz Gerald Green, Rohan Green, Glasford Green (the three of whom are brothers and may be referred to jointly hereafter as "the Green brothers"), Gladstone McIntosh, Gladstone Duncan, and the Appellants Boyd and Green (the latter of whom is not related to the Green brothers). J.A. 39-74.[1] All of the Green brothers named in the indictment pled guilty pursuant to plea agreements and testified against the Appellants, as did others who were also involved in the criminal network but were charged separately. The Appellants were charged as follows: Boyd, in three indictment counts, namely drug conspiracy, money laundering conspiracy, and use of a communication facility ("the telephone count") in furtherance of the drug conspiracy, in violation of 21 U.S.C. § 846, 18 U.S.C. § 1956(h), and 21 U.S.C. § 843, respectively; Green, in six indictment counts, namely drug conspiracy, money laundering conspiracy, use of a communication facility ("the telephone count") in furtherance of the drug conspiracy, and three separate substantive counts of possession with the intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 846, 18 U.S.C.

---

[1]The indictment also contained a request for forfeiture, in a minimum amount of $22.5 million, of all proceeds and property traceable therefrom in respect to the criminal activity alleged. Although the district court entered forfeiture orders as to each of the Appellants, they raise no issue on appeal as to those orders.

§ 1956(h), 21 U.S.C. § 843, and 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii), respectively.

On October 25, 2006, the Appellants were arraigned and pled not guilty. Appellant Boyd filed a timely pretrial motion to suppress $54,020 in United States currency agents had seized from his Florida home on the morning of his arrest. On August 16, 2007, the district court conducted an evidentiary hearing on the motion. For reasons stated on the record at the conclusion of the hearing, the court found that the currency had been seized in plain view during a constitutionally permissible protective sweep of Boyd's home; it therefore denied the motion to suppress. J.A. 172-77, 179.[2] On August 20, 2007, jury selection began, during which Boyd made a *Batson* objection based on the Government's use of its peremptory challenges to strike teachers from the jury venire.[3] J.A. 180. After argument by counsel, the district court overruled the objection, reasoning that the strikes were not constitutionally prohibited. J.A. 188-89.[4]

The trial proceeded and on August 28, 2007, the Government rested its case. Each of the Appellants moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that, in various respects, the evidence adduced by the Government at trial was insufficient to prove any of the charges against them. J.A. 682-87. The district court reserved ruling on the motions for judgment of acquittal. Boyd then presented evidence and rested. Green rested without presenting evidence. After the Appellants renewed their motions for judgment of acquittal, the Government withdrew Count 12 (the telephone count) as to Boyd and Count 3 (money laundering conspiracy) as to Green. J.A. 360-70, 692, 695, 699. The dis-

---

[2]Boyd challenges the district court's suppression ruling on appeal and we examine it *infra* at 23-26.

[3]*See Batson v. Kentucky*, 476 U.S. 79 (1986).

[4]Boyd challenges the district court's *Batson* ruling on appeal and we examine it *infra* at 27-28.

trict court further deferred ruling on the Rule 29 motions. J.A. 687.

In connection with the jury charge, Boyd's counsel timely excepted to the district court's failure to include Boyd's "theory of defense" instruction. J.A. 377; 710-11.[5] During closing argument, Boyd objected when counsel for the Government commented on certain behaviors engaged in by Boyd's counsel during the trial. The district court overruled the objection.[6]

The jury returned guilty verdicts on both counts submitted to them as to Boyd: drug conspiracy and money laundering conspiracy. The jury found Green guilty only of the drug conspiracy; it found Green not guilty on the telephone count, and it failed to reach a verdict as to the three substantive drug distribution counts. The district court declared a mistrial on the latter counts.

On September 28, 2007, Boyd filed a renewed motion for judgment of acquittal and a motion for a new trial. J.A. 30, 387A. Green also renewed his own motion for judgment of acquittal. J.A. 388-90. After hearing extensive argument from counsel, the district court denied those motions on December 7, 2007. J.A. 391-419, 439, 446.[7] The same day, the district court conducted a sentencing hearing. The court sentenced Boyd to 360 months of imprisonment on the drug conspiracy count and 240 months of imprisonment on the money laundering conspiracy count, to be served concurrently, and a period of supervised release. J.A. 475. The court sentenced Green to 151 months of imprisonment and a period of super-

---

[5]Boyd challenges the district court's rejection of his requested instruction on appeal and we examine the issue *infra* at 27-30.

[6]Boyd challenges the district court's ruling on his objection to the Government's closing argument on appeal and we examine the issue *infra* at 28-30.

[7]We examine the propriety of the district court's rulings on the motions for judgment of acquittal *infra* at 9-23.

vised release. J.A. 431. The district court entered its judgments on December 20, 2007. Green and Boyd filed timely Notices of Appeal and we consolidated the appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

As previously indicated, most of the testimonial evidence against the Appellants came from other participants involved in the years-long enterprise to supply "wholesale" quantities of cocaine from South Florida to dealers in Virginia. In addition to highly detailed inculpatory testimony from the Green brothers, who were co-defendants in the same indictment as the Appellants and who transacted numerous drug deals with both of the Appellants, the jury heard from two additional cooperating witnesses who testified pursuant to plea agreements: Brenton Shand (a cousin of the Green brothers) and Raymond Edwards. Despite vigorous cross-examination of the cooperating witnesses by counsel for the Appellants, the jury was entitled to credit so much of their testimony as it found to be accurate, truthful, and probative, and to find, ultimately, that the Government established the vast bulk of its allegations beyond a reasonable doubt. We briefly summarize some of that evidence.

Brenton Shand began cooperating with the Government after he was arrested in June 2001 in Newport News, Virginia. At the time of Shand's arrest, law enforcement officers recovered $300,000 in drug proceeds and three to four kilograms of cocaine from his residence. Shand testified that Appellant Green had delivered the cocaine to him. Shand had first met Green in Florida in 1996 through a drug dealer who had previously supplied Shand with drugs. During that early 1996-98 period, Shand sometimes worked with Fitz Gerald Green to unload cocaine from cars driven to Virginia from South Florida. The cars were packed at the Florida residence of Rohan Green and then driven to Virginia by various individuals,

among them, Gladstone McIntosh and Appellant Green.[8] During 1996 and 1997, Green drove multiple carloads of cocaine to Newport News from Florida, where he picked up the drugs from Rohan and Fitz Green. In early 2001, Shand relocated on a temporary basis to Florida because he believed (correctly) that he was being investigated in Virginia by law enforcement as a result of his narcotics activity. While in Florida, Appellant Green contacted him about distributing 30 kilograms of cocaine. Green wanted Shand to drive with the drugs to Virginia. Shand agreed to sell the drugs but ultimately did not drive the drugs to Virginia from Florida. During the summer of 2001, Appellant Green and Shand met in Newport News and Green delivered six kilograms of cocaine to Shand over the course of three days. The Government theorized that it was some of this cocaine that law enforcement officers seized when Shand was arrested in June 2001.

Fitz and Rohan Green had multiple sources of cocaine in Florida. Among them was Appellant Boyd, whom Shand had met in 2000 at Rohan Green's residence in Florida on an occasion when Boyd delivered 24 kilograms of cocaine at a cost of approximately $480,000. Those drugs were transported by Gladstone McIntosh from Florida to Virginia and distributed in Virginia by Shand and others. Boyd sometimes made drug deliveries in Florida (for further shipment to Virginia) on behalf of a man known as Aldwyn Powell, a/k/a "Po," when the latter was unavailable. Powell was the owner of Steppers, a Jamaican restaurant in Florida, where Boyd was employed and where he sometimes played dominoes with Shand. Shand acknowledged that he and Boyd never dealt drugs directly with each other.

Raymond Edwards was an active member of the drug dis-

---

[8]The jury heard testimony from a government agent that in a post-arrest statement, Appellant Green admitted to agents that on several occasions during 1997 and 1998, he received kilogram packages of narcotics in Florida and delivered them by automobile in Virginia.

tribution network until he was arrested in December 2002. Edwards and Boyd were introduced to one another by "Po" sometime during late 1998 or early 1999. Edwards sometimes purchased 10 to 15 kilograms of cocaine from Boyd as often as twice a week between 1999 and late 2002 for $16,000 per kilogram. Edwards provided Boyd with a tan Honda Accord with Virginia license plates. Boyd (or other participants in the distribution network) would secret the cocaine in the rear quarter panels of the Honda. Edwards would drive the drugs he obtained from Boyd in Florida to Glasford Green's residence in Williamsburg, Virginia, where he and Glasford Green would unload the drugs from the secret compartments in the car. After the drugs had been distributed in Virginia, the cash proceeds were hidden in the secret compartments for the return trip to Rohan Green's Florida residence and, ultimately, to pay for prior drug shipments and to purchase additional product for further transportation to Virginia.

In addition to the cooperating witnesses mentioned above, the Government also called several law enforcement witnesses. Special Agent David Miller testified, *inter alia*, in support of the money laundering conspiracy count. In particular, Agent Miller testified that he reviewed Boyd's federal income tax records for 1999 through 2004 as well as certain of Boyd's bank and mortgage records. J.A. 265, 266. He identified discrepancies between Boyd's stated income on his tax filings and the amount of expenditures and deposits that Boyd had made. J.A. 279-83. In 2001, Boyd had $23,806 in expenditures in excess of reported income. J.A. 287. In 2002 and 2003, Boyd had $43,898 and $29,905 in expenditures, respectively, in excess of his reported income. J.A. 289, 291. In 2004, the excess expenditures were $1,849.00. J.A. 292. Special Agent Miller limited his analysis of expenditures to transactions by Boyd in the purchase and sale of real property; he did not take account of ordinary living expenses, e.g., food, clothing, and utilities. J.A. 292. The jury was entitled to infer that had other routine expenses been included in Agent Miller's analysis, the discrepancy between reported income and

declared income was even greater than that testified to by Agent Miller.

On cross-examination of Agent Miller, Boyd's counsel sought to draw attention to other sources of income or funds available to Boyd that were not considered by Special Agent Miller, including funds from Boyd's spouse, as well as certain alleged disbursements to Boyd by a man named Eli Gordon who owned Eli's Foreign Cars ("Eli's"). With respect to Eli's, there was evidence that Boyd received (and submitted in support of some of his real property mortgage applications) what purported to be one or more form W-2s showing wages paid to him by Eli's. There was further evidence, however, that Eli's never submitted the alleged W-2s to the Internal Revenue Service or otherwise reported any such payments. J.A. 292-327. Thus, the jury was entitled to find that the alleged W-2s were false and fraudulently generated.

Because the district court denied Boyd's motion to suppress evidence (discussed *infra*), the jury also learned that agents seized $54,020 in United States currency, wrapped in rubber bands, from under Boyd's bed on the morning of his arrest. Thus, viewing the evidence in its totality, the jury could reasonably have inferred that Boyd had substantial unreported income, and that the income was likely derived from his involvement in narcotics trafficking.

## III.

Each of the Appellants argues that the district court erred when it denied his motion for judgment of acquittal. As explained herein, we reject their contentions.

We review *de novo* the district court's denial of a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *United States v. Ryan-Webster*, 353 F.3d 353, 359 (4th Cir. 2003). "[A]ppellate reversal on grounds of insufficient evidence . . . will be confined to cases

where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978). "In determining whether the evidence was sufficient to support a conviction, a reviewing court must determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Madrigal-Valadez*, 561 F.3d 370, 374 (4th Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"We review the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction." *Id.* (citation omitted). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (citation omitted). Further, a reviewing court may not assess the credibility of witnesses, but rather "must assume that the jury resolved all contradictions in testimony in favor of the Government." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

A.

Each of the Appellants was convicted of drug trafficking conspiracy under 21 U.S.C. § 846. To obtain a conviction for a drug conspiracy, the Government must prove the following essential elements: (1) an agreement between two or more persons to engage in conduct that violates a federal drug law; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy. *United States v. Wilson*, 135 F.3d 291, 306 (4th Cir. 1998). Once the Government proves a conspiracy, the evidence need only establish a slight connection between a defendant and the conspiracy to support conviction. *See United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992).

The Government is not required to prove that a defendant knew all his co-conspirators or all of the details of the conspiracy; moreover, guilt may be established even by proof that a defendant played only a minor role in the conspiracy. *United States v. Burgos*, 94 F.3d 849, 861 (4th Cir. 1996) (en banc). Nor does proof of guilt require a showing that a defendant personally committed an overt act. *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005).

1.

Here, the district court did not err in denying Green's motion for judgment of acquittal. Green purports to identify three separate reasons why the district court should have granted his Rule 29 motion. He contends first that the guilty verdict on the drug conspiracy count is fatally inconsistent with the jury's acquittal of him on the related telephone count and its inability to reach a verdict on the substantive drug trafficking counts. Furthermore, in arguments that we regard as simply two ways of saying the same thing, he contends (1) that the Government failed to prove that he committed an overt act in furtherance of the drug conspiracy within the applicable five year period of limitations, *see* 18 U.S.C. § 3282(a), and (2) that the evidence established as a matter of law that he withdrew from the conspiracy more than five years before the grand jury returned the indictment.[9] We find these contentions unpersuasive.

---

[9]The Government contends, albeit without much conviction, that Green has waived both his limitations and withdrawal defenses by failing to present them below. It has long been settled that a limitations defense must be affirmatively raised by the defendant. *See United States v. Williams*, 684 F.2d 296, 299 (4th Cir. 1982) ("The statute of limitations set forth in 18 U.S.C. § 3282 is not jurisdictional. It is an affirmative defense that may be waived."), *cert. denied*, 459 U.S. 1110 (1983) (citations omitted). In his brief, Green makes the rather curious assertion that, "[u]nfortunately, the jury was not adequately instructed regarding the statute of limitations," Appellants' Br. 54, but he does not assign error to the district court's jury instructions. In any event, as we discuss in text, although Green's articula-

The lynchpin of Green's first contention is the fact that the jury failed to reach a verdict on the indictment counts charging the three specific June 2001 distributions from Green to Shand in Newport News, Virginia. Green contends that, coupled with the jury's acquittal of him on the related telephone count, the jury's failure to reach a verdict on the June 2001 distribution counts means that Shand's testimony must be rejected altogether as not probative on the drug conspiracy count, the sole count on which Green was convicted.

Green's contention lacks merit. Shand testified, *inter alia*, that Green delivered cocaine to him in Virginia from 1998 until 2001, and specifically, after a telephone conversation between them, on several occasions in June 2001. The jury was entitled to credit all, part, or none of this (and any) testimony. Although we doubt that the jury's acquittal of Green on the telephone count is in any meaningful sense "inconsistent" with its guilty verdict on the drug conspiracy count,[10] it has long been settled that inconsistent jury verdicts do not call

tion of his contentions has been less than pellucid, the real basis for Green's contention is something of an amalgam: because the evidence shows as a matter of law that he withdrew from the conspiracy more than five years before the return of the indictment, the district court should have granted his motion for judgment of acquittal on the ground of limitations.

We discern no waiver by Green. In particular, because the indictment showed on its face that the alleged conspiracy continued into the period of limitations, Green was not obliged to file a pretrial motion to dismiss the indictment. *See United States v. Upton*, 352 F. Supp. 2d 92, 96 (D. Mass. 2005), *aff'd*, 559 F.3d 3 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 397 (2009). Raising the "limitations" issue at the close of the Government's case as an element of his Rule 29 motion for judgment of acquittal was sufficient to preserve the issue for appeal. *Cf. id.*, 559 F.3d at 9-10.

[10]The Government failed to produce at trial telephone toll records in support of the telephone count charged against Green although its theory was that Green and Shand had communicated about the June 2001 drug deal using mobile telephones. Thus, the failure to produce the toll records might fully explain the acquittal on the telephone count.

into question the validity or legitimacy of the resulting guilty verdicts. *United States v. Powell*, 469 U.S. 57, 64 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932); *United States v. Blankenship*, 707 F.2d 807, 810 (4th Cir. 1983). We decline Green's invitation to speculate as to the reasons for the jury's inability to reach a verdict on the substantive drug distribution counts.

As for Green's assertion that the Government failed to prove he committed an overt act in furtherance of the conspiracy within five years of the return of the indictment, we have already noted that the Government is not required to prove the commission of an overt act by a defendant convicted of conspiracy. *Cardwell*, 433 F.3d at 391. This is especially true in a drug trafficking conspiracy under 21 U.S.C. § 846, for which Congress has not imposed an overt act requirement at all. *See United States v. Shabani*, 513 U.S. 10, 15 (1994). In fact, this argument is simply a reformulation of Green's principal argument: that the trial evidence shows as a matter of law that Green withdrew from the conspiracy more than five years before the indictment was returned, and therefore the district court should have granted his motion for judgment of acquittal on the ground of limitations. However it is cast, the contention lacks merit.

To be sure, the cooperating witnesses substantially agreed that sometime in 1997 or 1998, after repeated incidents of missing money and missing drugs that had been entrusted to Appellant Green, Green's coconspirators threatened him with physical harm if not death. Indeed, there was testimony that the Green brothers forced Appellant Green to transfer to them two parcels of real property Appellant Green owned in Jamaica as compensation for their losses. After this transfer, Appellant Green apparently took a hiatus from active participation in the drug distribution network, at least as to any dealings directly with the Green brothers.

Notwithstanding these circumstances, the evidence of an internal conflict between Appellant Green and other members

of the conspiracy does not remotely support Appellant Green's contention that he affirmatively withdrew from the drug conspiracy and abandoned its purposes. To the contrary, as we have said, the jury was entitled to find, as it did find, that the overall conspiracy persisted well into the 2002 period (if not beyond) and, specifically, that Green's active personal involvement in the conspiracy resumed at some point and continued as late as June 2001, within the five years preceding the return of the indictment in January 2006. Thus, Green's assertion that evidence of threats he endured from his coconspirators is sufficient to establish his withdrawal from the conspiracy and his abandonment of its objectives as a matter of law is misplaced. This court has explained:

> Once a conspiracy is established, however, it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. *Hyde v. United States*, 225 U.S. 347, 369-70, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). A mere cessation of activity in furtherance of the conspiracy is insufficient. *United States v. Goldberg*, 401 F.2d 644, 648 (2d Cir. 1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). *The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his coconspirators. United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65, 98 S.Ct. 2864, 2887-88, 57 L.Ed.2d 854 (1978). The burden of proving withdrawal rests on the defendant. *United States v. Gillen*, 599 F.2d 541, 548 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979).

*United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986) (emphasis added); *see also United States v. Bennett*, 984 F.2d 597, 609 (4th Cir.) ("Once it is proven that a defendant was a member of the conspiracy, the defendant's membership in the conspiracy is presumed to continue until he withdraws

from the conspiracy by affirmative action."), *cert. denied*, 508 U.S. 945 (1993) (quoting *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989)). The evidence before the district court did not remotely satisfy the *Walker* standard for withdrawal.

In sum, we conclude that the district court did not err in rejecting Green's suggestion that the evidence of his 1998/1999 "expulsion" from the drug conspiracy constitutes a "withdrawal" from the conspiracy. The record evidence shows that Green may have been temporarily inactive as a result of his theft of product and proceeds from other members of the conspiracy. This inactivity, however, does not support his assertion that he withdrew from the conspiracy and abandoned its objectives, let alone that he did so outside of the period of limitations. We find, therefore, that the district court correctly denied Green's motion for judgment of acquittal.[11]

2.

Appellant Boyd's challenge to his conviction on the drug conspiracy charge fares no better than Green's challenge. Indeed, the record before us shows conclusively that Boyd's ostensible sufficiency-of-the-evidence challenge to his conviction on the drug conspiracy charge has been waived. At the conclusion of his argument on the Rule 29 motions, counsel for Boyd stated the following to the district court:

> So . . . that leav[es] us with [the drug conspiracy.] That's a jury question, quite frankly, Judge. I'd like to say it's not. I'd like to say I'm entitled to a judgment of acquittal, but there are also — it's my responsibility to be candid with the Court. I don't

[11]In a recent unpublished opinion, *United States v. Wilkins*, No. 08-4372, 2009 WL 4458531, *5 (4th Cir. Dec. 4, 2009), we considered, and rejected, the very same argument that Green makes in this case on facts substantially the same as those here.

>   believe there is a basis under which the Court should
>   properly grant a 29 [sic] on that.

J.A. 695 (alterations added). Boyd was correct to make the above concession, for, as we have noted in summarizing the testimony of his coconspirators, the record reflects that overwhelming evidence was presented sufficient to establish the existence of the charged drug conspiracy and Boyd's knowing membership and active participation in the conspiracy.[12]

## B.

Only Boyd was convicted of money laundering conspiracy. To obtain a conviction for money laundering conspiracy under 18 U.S.C. § 1956(h), the Government must prove the following essential elements: (1) the existence of an agreement between two or more persons to commit one or more of

---

[12]Despite his abandonment of the claim of insufficient evidence to prove his knowing membership in the drug conspiracy, Boyd argues on appeal that he was a member of a "Florida conspiracy," not the "Virginia conspiracy" established by the Government's proof. *See* Appellants' Br. 17-18. This contention is belied by the trial evidence, which we need not repeat here. We have previously articulated our standard of review for sufficiency of the evidence, as well as the elements of a drug conspiracy. Here, the Government presented overwhelming direct and circumstantial evidence that Boyd participated in the drug conspiracy as one of the main Florida-based suppliers of cocaine to a robust Virginia market. Bertrand Shand, Raymond Edwards, and Fitz Green all directly implicated Boyd as an integral part of a network that moved cocaine from Florida to Virginia in return for money shipped from Virginia to Florida. While it is true that Boyd never entered Virginia himself, as a member of a drug conspiracy aimed at supplying the Virginia market, evidence of his physical presence in Virginia was unnecessary. Similarly, Boyd's assertion before us that he did not know the ultimate destination of the drugs he delivered in Florida is both factually and legally immaterial, even if, despite any evidence to support the assertion, the assertion of such lack of knowledge were true. (Recall, for example, that Edwards testified that he provided a tan Honda bearing Virginia tags to Boyd in which to store drugs for transport.) Accordingly, there was sufficient evidence here to prove Boyd's involvement in the overall drug distribution conspiracy proven at trial.

the substantive money laundering offenses proscribed under 18 U.S.C. § 1956(a) or § 1957; (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008) (citation omitted). Congress has provided for venue of the money laundering conspiracy offense described in § 1956(h) in 18 U.S.C. § 1956(i), which provides as follows in pertinent part:

> (i) Venue.—(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—
>
> * * * *
>
> (2) A prosecution for an attempt or conspiracy offense under this section . . . may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

18 U.S.C. § 1956(i). Thus, under this provision, venue over the money laundering conspiracy charge would lie in the Eastern District of Virginia, *inter alia*, if any member of the money laundering conspiracy committed an overt act in furtherance of the conspiracy there.

### 1.

In regard to his conviction on the charge of money laundering conspiracy, Boyd mounts a three-pronged attack. He contends that the Government failed to adduce sufficient evidence to prove: (1) "that [Boyd] conspired with anyone to launder drug proceeds," Appellant's Br. 30; (2) "that any of the transactions about which evidence was presented actually involved drug proceeds," *id*.; or (3) that the Eastern District

of Virginia was a proper venue. *Id*. at 39. We reject each of these contentions.

In advancing his arguments on the alleged insufficiency of the evidence as to the money laundering conspiracy charge, Boyd seeks to limit us to an examination of the testimony of Special Agent Miller and, in particular, the scant evidence of Boyd's apparent interactions with Eli Gordon of Eli's Foreign Cars. *See supra* at 8-9. But such a cramped view of the Government's evidence of money laundering conspiracy is wholly unwarranted. First, as the Government points out, the indictment's money laundering conspiracy count (Count 3) expressly incorporated by reference all of the 66 overt acts charged in the indictment's drug conspiracy count (Count 2). Second, all of the defendants charged in the indictment were named in both the drug conspiracy and in the money laundering conspiracy. Thus, it is apparent that the grand jury alleged that acts aimed at obtaining the proceeds from trafficking in illegal narcotics also comprised acts taken in furtherance of the parallel money laundering conspiracy, i.e., that earning revenue from the drug trafficking conspiracy was part of the overall money laundering conspiracy.

We are mindful that, as with proof of a drug conspiracy, a money laundering conspiracy does not require proof of an overt act, *Whitfield v. United States*, 543 U.S. 209, 219 (2005), and so we do not suggest that proof of an overt act is an essential element of a money laundering conspiracy offense under 18 U.S.C. § 1956(h). Nevertheless, as this case shows, proof of overt acts can be useful for, among other things: (1) showing that a conspiracy begun more than five years before the return of an indictment continued into a period within the statute of limitations; (2) showing that a particular defendant knowingly joined (or remained a member of) a conspiracy; and (3) establishing that venue exists in a particular federal judicial district. *See id*. at 218. We know of no reason that a grand jury is prohibited from charging that, under the circumstances presented by particular evidence,

engaging in a drug conspiracy was part and parcel of engaging in a parallel money laundering conspiracy, notwithstanding that no overt act is required to prove either conspiracy.

This rather aggressive tack on the Government's part is not unprecedented. *See, e.g.*, *United States v. Bolden*, 325 F.3d 471, 490-92 (4th Cir. 2003) (overt acts alleged in indictment count charging mail fraud scheme incorporated by reference into indictment count charging money laundering conspiracy; convictions affirmed). Accordingly, it is no exaggeration to observe that, given the manner in which the two overlapping conspiracy counts have been framed in the case before us, virtually all of the evidence presented in support of the drug conspiracy count prosecuted pursuant to 21 U.S.C. § 846 was potentially probative of Boyd's alleged involvement in the money laundering conspiracy prosecuted pursuant to 18 U.S.C. § 1956(h). Notably, Boyd has never raised any objection to the facial validity of the indictment itself or to the district court's jury instructions on the two conspiracy counts of the indictment. This absence of any objection shows that the Government's broad theory of this prosecution, embraced by the grand jury that returned the indictment, was permissibly embraced by the trial jury, as well. Accordingly, it is not appropriate for us to consider only the evidence of Boyd's interactions with Eli's in assessing whether substantial evidence supports the jury's guilty verdict on the charge of money laundering conspiracy.

2.

In light of the above analysis, it is apparent that the fundamental flaw in Boyd's attack on his money laundering conspiracy conviction is that Boyd treats the offense of conviction as if it were a substantive money laundering offense rather than what it is: conspiracy to commit a money laundering offense. As the Government readily concedes, any substantive money laundering violation by Boyd could not have been prosecuted in the Eastern District of Virginia, but

only in Florida, where Boyd resided, where he engaged in real estate transactions, and where he engaged in transactions with Eli Gordon of Eli's, each, allegedly, using proceeds from his drug trafficking activity. *See United States v. Cabrales*, 524 U.S. 1, 5-6 (1998) (determining venue for substantive money laundering offenses). Clearly, the Government adduced evidence of Boyd's specific Florida transactions (through the testimony of Agent Miller and the related documents) to bolster its claim that, like the Green brothers and other members of the overall criminal network involved here, Boyd not only intended to make money from dealing drugs, but also intended to use those drug proceeds in financial transactions with the specific intent to "promote" further drug deals and/or to "conceal" the "nature, the location, the source, the ownership, or the control of the proceeds of" the drug dealing activity. *See* 18 U.S.C. § 1956(a)(1)(B)(i); *see generally Bolden*, 325 F.3d at 490-92 (explaining the elements of "promotion money laundering" and "concealment money laundering"). As Judge King explained in *Bolden*:

> In the common understanding, money laundering occurs when money derived from criminal activity is placed into a legitimate business in an effort to cleanse the money of criminal taint. The money laundering statute, however, as codified at *18 U.S.C. § 1956(a)(1)*, proscribes a much broader range of conduct, specifically prohibiting four distinct types of money laundering activity. In order to contravene *§ 1956(a)(1)*, a defendant must, first of all, know that the property involved in a "financial transaction" represents the "proceeds" of some "specified unlawful activity." If this "proceeds" element is satisfied, a money laundering violation occurs when a defendant conducts or attempts to conduct a financial transaction:
>
> > (1) intending to promote the carrying on of specified unlawful activity ("promotion money laundering"); or

* * *

>    (3) knowing that the financial transaction is
>    designed to conceal the nature of the proceeds of
>    specified unlawful activity ("concealment money
>    laundering").

*Id*. at 486-87; *see also United States v. Wilkinson*, 137 F.3d
214, 221 (4th Cir. 1998).

Plainly, the underlying object of the money laundering con-
spiracy charged here, i.e., the substantive money laundering
offense intended to be completed, was, as the indictment
alleged in part, J.A. 55, "concealment money laundering."
The evidence presented through Agent Miller and summa-
rized, *supra* at 8-9, was sufficient (whether or not it was,
strictly speaking, necessary) to bolster the Government's
showing that the drug traffickers had the *specific intent* to do
something with the proceeds of their drug trafficking activi-
ties other than merely spend the money on ordinary living
expenses, or even on extravagances. *Cf. United States v. Nich-
olson*, No. 04-4794, 176 Fed. App'x. 386, 395 (4th Cir. April
18, 2006) (Michael, J., concurring in part and dissenting in
part) ("Spending money is legal. Laundering money by con-
cealing is not.").

Most assuredly, the Government is not required to prove
beyond a reasonable doubt that a defendant actually possessed
narcotics to show beyond a reasonable doubt his knowing
membership in a drug trafficking conspiracy. *United States v.
Collazo*, 732 F.2d 1200, 1205-06 (4th Cir. 1984), *cert. denied*,
469 U.S. 1105 (1985). Similarly here, the Government was
not required to prove beyond a reasonable doubt Boyd's par-
ticipation in any actual financial transaction knowingly using
drug trafficking proceeds while intending to conceal the "na-
ture, the location, the source, the ownership, or the control of"
drug trafficking proceeds in order to prove beyond a reason-
able doubt Boyd's knowing participation in the charged

money laundering conspiracy which had, as its object, exactly that.[13] Thus, the testimony of Agent Miller regarding the real estate transactions, the tax returns, and the W-2s from Eli's, coupled with the inculpatory testimony of Boyd's numerous co-conspirators and the evidence of the large amount of rubber-banded cash seized from under Boyd's bed, was more than sufficient to permit a reasonable juror to find beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to commit "concealment money launder-ing" as proscribed under 18 U.S.C. § 1956(a); (2) that Boyd knew that at least some of the money intended to be used in the financial transactions constituted proceeds derived from the very drug conspiracy in which he was a knowing partici-pant; and (3) that Boyd knowingly and voluntarily became part of the money laundering conspiracy having those pur-poses and objects. *See Singh*, 518 F.3d at 248. Accordingly, we reject Boyd's conclusory assertions that the evidence failed to prove the money laundering conspiracy charge because it failed to show "that [Boyd] conspired with anyone to launder drug proceeds" (it did), or "that any of the transac-tions about which evidence was presented actually involved drug proceeds" (there was substantial direct and circumstan-tial evidence that the funds Boyd employed in those transac-tions almost certainly included drug proceeds).[14] Likewise, we

---

[13]We do not mean to say that the evidence of Boyd's Florida financial transactions was insufficient to prove *substantive money laundering viola-tions* beyond a reasonable doubt. We simply point out that the Govern-ment was not required to shoulder that burden to prove the *money laundering conspiracy* charged in this case.

[14]Whatever skepticism we may harbor, notwithstanding the Govern-ment's expansive charging decision, as to whether the evidence would be sufficient to prove that "promotion money laundering" was an object of the money laundering conspiracy contained in the indictment is of no moment. *See Griffin v. United States*, 502 U.S. 46, 51 (1991) (holding that the Due Process Clause does not require a general guilty verdict on a multi-prong conspiracy be set aside if the evidence is inadequate to sup-port conviction as to one of the objects); *United States v. Moye*, 454 F.3d 390, 399-402 (4th Cir. 2006). Similarly, we need not speculate as to whether the money laundering conspiracy charge would be sustained absent the evidence related to Eli's and the fraudulent W-2s.

reject Boyd's challenge to venue. Undoubtedly, the jury reasonably could have found, as it did, that Boyd's coconspirators in the money laundering conspiracy, including but not limited to one or more of the Green brothers, committed overt acts in furtherance of the money laundering conspiracy in the Eastern District of Virginia. No more was required to support venue in that district. 18 U.S.C. § 1956(i)(2).

* * * *

For all of these reasons, the district court did not err in denying the motions for judgment of acquittal.

## IV.

We next consider Boyd's contention that the district court erred in denying his motion to suppress the cash seized from his bedroom. We conclude that the district court's determinations should not be disturbed.

## A.

In assessing a trial court's ruling on a motion to suppress, we review factual findings for clear error and legal determinations *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Wardrick*, 350 F.3d 446, 451 (4th Cir. 2003). When a motion to suppress has been denied in the court below, we review the evidence in the light most favorable to the Government. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

## B.

Federal Bureau of Investigation agents and local law enforcement officers, acting pursuant to an arrest warrant issued on the basis of the indictment returned in this case, went to Boyd's Florida home in September 2006 to arrest Boyd. J.A. 84-86. The officers knocked and arrested Boyd

when he opened the door. Several officers entered the residence because they saw other individuals moving about inside. J.A. 78, 81, 105. Once inside the residence, the officers discovered several other individuals, including Boyd's spouse and teenage son, J.A. 106, 116-17, each of whom they secured in the living room. J.A. 118, 120-21.

The officers promptly conducted a protective sweep of the entire residence, during which one of them looked under the bed in the master bedroom. Partially under the bed, the officer noticed an open plastic bag with "bundles of money inside." J.A. 86-88. The case agent, FBI Special Agent Rene Ovalle, read Boyd his rights, asked Boyd if he understood them, and began questioning Boyd.[15] J.A. 109-10, 129-31. Special Agent Ovalle asked Boyd about the money, and he replied that it was almost $60,000 and was to be used to pay off his wife's automobile loan and to purchase additional automobiles. J.A. 79-80, 110. Agent Ovalle seized the cash, which amounted to $54,020. The cash was bound in rubber bands and packaged in envelopes and black plastic bags. J.A. 645.

After considering the evidence presented by the Government at the hearing on Boyd's motion to suppress, the district court ruled from the bench. It found that there was reasonable cause for the officers effecting Boyd's arrest to conduct a protective sweep of the Boyd residence during their presence on and about the premises. The court determined that a cursory inspection of the space beneath the bed in the master bedroom was reasonable because a person could have hidden there. Moreover, the court found and concluded that the currency was discovered in plain view and properly seized.

Boyd contends that the police unlawfully extended their protective sweep of his home to his bedroom and under his

---

[15]Special Agent Ovalle questioned Boyd without obtaining an express waiver of rights under *Miranda* but Boyd does not raise any *Miranda* issue on appeal. J.A. 129.

bed. Boyd argues that since the police should not have been looking under Boyd's bed, as there was no reasonable fear for their safety from anyone hiding there, they did not lawfully find the money. Also, he argues, because the amount of money could not be ascertained without disturbing it, its incriminating character was not "immediately apparent" as required to justify a plain view seizure of evidence. Accordingly, Boyd contends, the seized money should have been suppressed. We disagree.

## C.

Where law enforcement officers possess an arrest warrant and probable cause to believe a suspect is in his home, the officers may enter and search anywhere in that residence in which the suspect might be found. *Maryland v. Buie*, 494 U.S. 325, 332-33 (1990). Where officers enter a residence in search of a suspect, they may satisfy themselves that: "the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333. Accordingly, a protective sweep may be conducted in the interest of officer safety.

A protective sweep — where the circumstances justify it — does not entitle officers to conduct a full search of the premises, but rather extends only to a limited inspection of spaces where a person may actually be found. *Id.* at 335. Furthermore, the sweep may last no longer than needed "to dispel the reasonable suspicion of danger" and no longer than needed to arrest the suspect and leave the premises. *Id.* at 335-36. We have expressly indicated that searching under beds is within the ambit of a protective sweep. *United States v. Stanfield*, 109 F.3d 976, 988 (4th Cir. 1997). Accordingly, here, the officers' protective sweep, which encompassed a look under

Boyd's bed, was appropriate, and the district court did not err in so concluding.[16]

Furthermore, the evidence in the record fully justified the district court's finding that the officer who discovered the cash horde did not need to move or jostle the items under the bed to see it. He observed it in plain view. "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)); *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994)). Here, the officer was lawfully in a place from which the money could be plainly viewed, and he had a lawful right to access the money. Unmoored from its context, the incriminating character of what looks to be a large sum of money in a bag under a bed may not be immediately apparent. However, given the reason that the officers secured the arrest warrant and went to Boyd's residence in search of him, the money's incriminating character, as probable proceeds from narcotics transactions and thus the fruit of illegal activity, could be immediately inferred. Accordingly, the district court did not err in denying Boyd's motion to suppress the cash seized from under his bed.

---

[16]The parties disputed before the district court whether Boyd was arrested just inside the threshold of his home and then brought outside, on the one hand, or was arrested outside the threshold and then moved to the lawn or driveway of the residence, on the other hand. In the view we take of the case, the propriety of the protective sweep does not turn on this issue. Rather, the officers were fully justified in entering the residence even if Boyd was seized outside the threshold. The officers clearly saw that other persons were inside the residence, persons who posed a potential threat of harm to them, if they were not secured, even after Boyd himself had been taken into custody. Once inside the premises, the officers and agents acted reasonably in electing to conduct, and in their conduct of, the protective sweep.

## V.

Boyd next contends that the district court erred when it rejected his challenge to the prosecution's use of its preemptory strikes to excuse several women because, according to the prosecutor, they were teachers.[17] Boyd argues that since most teachers in the United States are women, striking the teachers was merely pretext for gender discrimination. Thus, according to Boyd, the district court erred when it failed to sustain his *Batson* challenge to the Government's strikes. We disagree.

We accord great deference to the district court's finding as to whether a peremptory challenge was exercised for a prohibited, discriminatory reason; we review that finding for clear error. *Cf. Hernandez v. New York*, 500 U.S. 352, 364-65 (1991) (given that a finding of race discrimination turns largely on credibility determinations, a district court's findings in a *Batson* challenge are reviewed for clear error). This is because a district court is particularly well-suited to resolve challenges to peremptory strikes of jurors, as it has first-hand knowledge of the very act in dispute. *See McMillon v. United States*, 14 F.3d 948, 953 (4th Cir. 1994); *United States v. Grandison*, 885 F.2d 143, 146 (4th Cir. 1989), *cert. denied*, 495 U.S. 934 (1990).

It is a violation of the equal protection principle for a juror to be excused in an invidiously discriminatory fashion. *J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127 (1994) (holding that making peremptory challenges based solely on a prospective juror's sex is unconstitutional); *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that a prosecutor's use of peremptory challenge to exclude jurors based solely on their race is unconstitutional).

---

[17]The Government stated, when asked what it had against teachers, that "[t]eachers get in the back, and they like to tell as opposed to listening." J.A. 180.

When a party challenges his opponent's exercise of a peremptory challenge on equal protection grounds, that party bears the burden of proving *intentional discrimination*. *Batson*, 476 U.S. at 93; *Hernandez*, 500 U.S. at 373 (O'Connor, J., concurring). Here, Boyd does not call into question the *bona fides* of the prosecutor's explanation for its strikes: that it prefers to have no teachers on the jury in a case of this type. Rather, Boyd essentially seeks an expansion of the *Batson* prohibition to cover not only strikes that are *intentionally invidiously discriminatory*, but those having a discriminatory *effect*. We are not authorized to expand this doctrine beyond the intentional discrimination boundaries dictated by the Supreme Court and into the realm of discriminatory effect. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) (violations of the Equal Protection Clause arise only on a showing of intentional discrimination). Thus, the district court did not err when it declined to sustain Boyd's *Batson* challenge. *See United States v. Johnson*, 4 F.3d 904, 913-14 (10th Cir. 1993) (holding that all teachers may be removed from a jury venire), *cert. denied*, 510 U.S. 1123 (1994); *United States v. Davis*, 40 F.3d 1069, 1077 (10th Cir. 1994) (same).

## VI.

Next, Boyd contends that he was prejudiced when the district court declined to give his "theory of defense" jury instruction. We disagree.

We review the district court's decision to give or refuse to give a jury instruction for abuse of discretion. *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). "[W]e do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* (quoting *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996)). "As long as the instructions have an evidentiary foundation and are accurate statements of the law, the district court should include instructions 'to instruct the

jury in the defendant's theory of defense.'" *United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) (quoting *United States v. Mitchell*, 495 F.2d 285, 287-288 (4th Cir. 1974)).

> A refusal to give a requested theory of defense instructions is reversible error only if the instruction '(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'

*Passaro*, 577 F.3d at 221 (quoting *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995)).

Boyd requested the district court to give the following instruction:

> Mr. [Boyd] has denied the charges in the indictment based on his plea of not guilty. Mr. [Boyd] contends that he was not involved in the criminal acts with which he is charged and that he was falsely implicated by those who were involved.

> Those who have accused Mr. [Boyd] of being involved in this Conspiracy to Possess with Intent to Distribute Cocaine are motivated to falsely accuse him in an effort to better their own circumstances.

> All of the government witnesses who testified that Mr. [Boyd] was involved in the criminal acts alleged had the opportunity to meet him under innocent circumstances that were completely unrelated to any criminal conduct on his part.

> With respect to the evidence of unexplained wealth presented by the government, Mr. [Boyd]

contends that such evidence is indicative of the fact that he may not have accounted for all of his income on his Federal Tax Returns, but does not prove that any of the funds about which the government presented evidence, were derived from drug related activity.

J.A. 387A.

The district court refused to give the instruction. It noted that the instruction requested by Boyd was generally correct in its statements of legal principles. However, the court further noted that the law does not go so far as to include within jury instructions counsel's specific argument on those points of law. The court stated that it had "covered credibility and all other points in a more general fashion." J.A. 377, 710-11.

The district court did not abuse its discretion. Despite Boyd's contention that his proposed instruction may have more adequately presented his defense theory, the first three paragraphs of his proposed instructions were clearly covered by the instructions given by the district court, a point that Boyd concedes. Appellants' Br. 33; *see* J.A. 378-83. "[A]lthough a more specific instruction might have been desirable to [Boyd], it cannot be said that the district judge abused his discretion in this instance." *United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998); *United States v. Guay*, 108 F.3d 545, 550 (4th Cir. 1997).[18]

---

[18]Although the points made in the last paragraph of Boyd's proposed instruction were not specifically covered by any of the district court's instructions, we cannot say that that paragraph "dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Lewis*, 53 F.3d at 32. Perhaps more fundamentally, it seems to us that the assertion that unexplained, unreported cash is, categorically, not probative of illegal activity, including drug trafficking, is an incorrect statement of the law. Such evidence is indeed circumstantial evidence of illegal activity other than tax offenses.

## VII.

Finally, Boyd complains that during closing arguments, the Government improperly commented on his counsel's behavior during the trial.[19] Boyd's counsel objected, and the district court overruled the objection. Boyd argues that commenting on defense counsel is improper and that here the comment was so prejudicial that it denied Boyd a fair trial. We disagree.

A trial court has broad discretion to control closing argument, and we review its rulings on objections for abuse of discretion. *United States v. Ollivierre*, 378 F.3d 412, 417 (4th Cir. 2004) (citations omitted), *vacated on other grounds by Ollivierre v. United States*, 543 U.S. 1112 (2005). If a trial court abuses its discretion in addressing an objection to closing argument, that abuse will justify reversal of a conviction only if it constitutes prejudicial error. *Id.* (citing *United States v. Young*, 470 U.S. 1, 13 n.10 (1985)).

We have carefully considered this assignment of error and we find that the district court did not abuse its discretion in overruling Boyd's objection to the Government's fleeting allusion to defense counsel during closing argument. *See United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990); *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998).

---

[19]During closing arguments, the Government stated: "There was a telling moment in this trial, ladies and gentlemen, when the Court admonished counsel to stop the theater. That's because what we've done here, ladies and gentlemen, is we've had to respond to the theater, the rolling of eyes, the twirling around." J.A. 387, 714. Defense counsel objected, stating that this was "improper argument," and the court overruled the objection. J.A. 387; J.A. 714. The Government went on to ask the jury not to be distracted and focus on the facts. J.A. 387; J.A. 714-15. In fact, during trial, the district court had made a comment to defense counsel when counsel engaged in certain demonstrative behaviors, e.g., rolling of eyes at witnesses and a dramatic pirouette.

VIII.

To summarize our rulings, we conclude that the evidence was sufficient to support the Appellants' convictions beyond a reasonable doubt and that the district court did not err in denying the motions for judgment of acquittal. Furthermore, we find that the district court did not clearly err in finding that the search of Appellant Boyd's residence, and in particular the area under the bed in the master bedroom, was a permissible protective sweep intended to safeguard the officers effecting Boyd's arrest. We further conclude that the court correctly applied the plain view exception to the Fourth Circuit warrant requirement. Finally, we find no abuse of discretion or error of law in respect to the district court's rulings in the management of the proceedings below as challenged in these appeals. Accordingly, we affirm.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting in part:

I fear that under the majority's rationale, anytime a participant in a drug conspiracy undertakes a financial transaction with money, which cannot be accounted for in his income tax filing, he is assumed to be in a money laundering conspiracy with the other members of the drug conspiracy. Because I believe we must hold the government to its burden of proving a separate agreement to launder illegally-obtained proceeds, I dissent from the majority's opinion in part III.B.

I.

Boyd was charged with violating 18 U.S.C. § 1956(h), which provides: "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C.A. § 1956(h) (West 2009). The indictment charged that

Boyd conspired to commit an offense under section 1956(a)(1), namely either "promotion money laundering,"[1] *id.* § 1956(a)(1)(A)(1), or "concealment money laundering,"[2] *id.* § 1956(a)(1)(B)(1). Therefore, Boyd must have agreed with another person to undertake a financial transaction with the intent to either further the original illegal activity or conceal the proceeds of it.

In order to prove a violation of section 1956(h), the government must show "(1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy." *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008) (citing *United States v. Alerre*, 430 F.3d 681, 693-94 (4th Cir. 2005)). No overt act need be shown for the conviction; the agreement alone is sufficient. *Whitfield v. United States*, 543 U.S. 209, 219 (2005). However, overt acts are often helpful in determining whether an agreement is reached in the first place. It is unlikely that the government would have a paper trail which sets out the agreement to launder money. Rather, the agreement most often is inferred from circumstantial evidence tending to show the conspiracy. *See United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (holding that because conspiracies are clandestine, resulting in little direct evidence, they are often proven entirely by circumstantial evidence).

The majority concludes that because the overt acts were alleged to be the same in the drug and money laundering

---

[1]Promotion money laundering requires that the government "(1) trace the money at issue to an underlying unlawful activity, and (2) prove that the money was transferred in order to promote a specified unlawful activity." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

[2]Concealment money laundering requires that the government trace the money at issue to the underlying unlawful activity and additionally that the defendant transferred the funds to conceal or disguise their illegal origins. *Id.* at 693 n.14.

charges, the conviction on the drug charges necessarily shows that Boyd additionally conspired with the members of the drug conspiracy to commit money laundering. I, on the other hand, see a fundamental lack of evidence that Boyd agreed with *any* of the participants in the drug conspiracy to launder money. In a sufficiency of the evidence challenge, we are to draw all reasonable inferences from the evidence in favor of the government. Those inferences, however, must be based on actual evidence, not merely assumptions about the nature of drug trafficking crimes.

Agent David Miller testified for the government as to Boyd's alleged money laundering activities. His conclusions were based on a review of Boyd's tax documents and banking records. In essence, Miller testified to discrepancies between Boyd's spending and the income he reported to the IRS. To do so, Miller examined Boyd's tax returns, cash deposits, and expenditures.[3] The crux of the government's money laundering case was a presentation of the real estate investments Boyd made which involved down payments and mortgage obligations greater than the income he reported to the IRS.

The majority concludes that this evidence, along with the evidence proving that Boyd was part of the drug conspiracy, was sufficient to uphold the money laundering conviction. It is telling, however, that the majority never even mentions what evidence shows the *agreement* between Boyd and another person. Instead, the majority simply concludes that Agent Miller's testimony was sufficient "to bolster the Gov-

---

[3]Boyd's main contention on appeal is that Miller did not eliminate other potential sources of income, particularly his wife's, when concluding that Boyd was spending more than he had in lawful reported assets. While I do not explore this argument in depth given my conclusion about the failure to prove an agreement, I do note that this type of burden shifting, whereby the government can prove a prima facie case of money laundering when the defendant spent more money than he reported, raises troubling constitutional questions when the government has charged *money laundering* and not *tax fraud*.

ernment's showing that the drug traffickers had the *specific intent* to do something with the proceeds of their drug trafficking activities other than merely spend the money on ordinary living expenses." Maj. Op. at 21 (emphasis in original). Yet, this is only an assumption that if the defendants had agreed to drug trafficking, they must have agreed to conceal the proceeds. However, the only evidence of potential money laundering shows that Boyd was undertaking transactions alone. Thus, while the majority resorts to the assumption that the members of the conspiracy must have jointly decided to hide their money, I find a total lack of evidence of any such agreement.

The result of this case, in my opinion, will be to encourage the government to charge a money laundering conspiracy every time a drug trafficking conspiracy is charged if there is evidence that one co-conspirator made any financial transaction. This cannot be what Congress intended in enacting the separate offense of conspiracy to launder money and requiring proof of such an agreement.

## II.

Because I find insufficient evidence to sustain Boyd's conviction for money laundering conspiracy, I would reverse his conviction and remand his case for resentencing.[4]

---

[4]As the government explains in their submission to the Court after oral argument, *see* Fed. R. App. Proc. 28(j), if Boyd's money laundering conspiracy conviction was reversed, his sentencing guidelines range on the drug trafficking charges would change from 360 months–life to 292–360 months, thus necessitating his resentencing by the district court.