**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4488**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAMES MICHAEL FARRELL,

Defendant – Appellant.

------------------------------

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Amicus Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:15-cr-00562-RWT-1)

Argued: November 1, 2018                    Decided: April 5, 2019

Before KING, FLOYD, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Floyd and Judge Thacker joined. Judge Thacker wrote a separate concurring opinion.

**ARGUED:** Barry Coburn, COBURN & GREENBAUM, PLLC, Washington, D.C., for Appellant. Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland for Appellee. **ON BRIEF:** Robert K. Hur, United States Attorney, Lynn Juan, Law Clerk, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore,

Maryland, for Appellee.  David B. Smith, Vice Chairperson, Elizabeth Franklin-Best, Vice Chairperson, Amicus Curiae Committee, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, Washington, D.C.; Catherine E. Creely, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Amicus Curiae.

———————————

2

KING, Circuit Judge:

James Michael Farrell was convicted after an early 2017 jury trial in the District of Maryland for ten offenses of money laundering conspiracy, substantive money laundering, and related charges of obstruction of justice. Farrell, a former lawyer, was prosecuted for his role as the so-called "consigliere" of an elaborate multi-state marijuana trafficking organization. On appeal, Farrell contests several rulings made by the district court concerning evidence sufficiency, evidence admissibility, and jury instructions. As explained below, we reject his contentions of error and affirm the judgment.

I.

A.

In October 2015, the federal grand jury in Maryland indicted Farrell for twelve offenses. Count One alleged that, from 2009 to 2013, Farrell was involved in a money laundering conspiracy that conducted financial transactions relating to monetary proceeds generated by the unlawful activity of marijuana trafficking, which transactions were used to conceal and disguise the illegal source of such proceeds, in violation of 18 U.S.C. § 1956(h).[1] The indictment alleged that the monetary proceeds used in the conspiracy

---

[1] As part of the 1986 congressional enactment that created the relevant money laundering offenses, the Racketeer Influenced and Corrupt Organizations Act (commonly called "RICO"), was amended to include money laundering in the RICO definition of "racketeering activity." *See* 18 U.S.C. § 1961(1)(B). One primary purpose of the enactment was to improve the federal interdiction of organized crime, including drug trafficking organizations. The money laundering conspiracy offense alleged against
(Continued)

3

offense came from a marijuana trafficking organization led by a man named Matt Nicka, and which maintained a primary hub in Maryland (hereinafter, the "Nicka Organization" or the "Organization"). The Nicka Organization was responsible for distributing and selling thousands of pounds of marijuana in the eastern and southern United States, and it generated millions of dollars from those illicit transactions.

Counts Two, Three, Five, Six, Seven, and Twelve of the indictment made substantive allegations of money laundering against Farrell, pursuant to 18 U.S.C. § 1956(a)(1)(B)(i).[2] More specifically, Counts Two, Three, Five, and Six charged Farrell with writing checks on his law firm's bank account — wherein he had deposited funds

---

Farrell in Count One contravened subsection (h) of § 1956 of Title 18, which provides in pertinent part that:

> Any person who conspires to commit any [money laundering] offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense [that] was the object of the conspiracy.

[2] The substantive money laundering offenses were violations of § 1956(a)(1)(B)(i) of Title 18, which provides penalties for:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> . . . .
>
>> (B) knowing that the transaction is designed in whole or in part—
>>
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

4

received from Nicka and the Nicka Organization — to assist several of its drug dealers, or so-called "members," in obtaining legal services. In Counts Seven and Twelve, the indictment alleged that Farrell laundered drug trafficking proceeds by securing money orders that he used to support an imprisoned member of the Organization.

Counts Four, Nine, and Eleven charged Farrell with attempting to obstruct proceedings of the Drug Enforcement Administration (the "DEA") (Count Four), and also to obstruct proceedings in the federal court in Maryland (Counts Nine and Eleven), in contravention of 18 U.S.C. § 1512(c)(2).[3] Pertinent to this appeal, Count Four alleged that Farrell corruptly attempted to influence a DEA administrative forfeiture proceeding involving a Nicka Organization drug dealer by, inter alia, advising the drug dealer not to disclose the source of certain property and by forging affidavits submitted to the DEA. Count Nine charged that Farrell had corruptly attempted to influence the federal prosecution of Organization drug dealers in Maryland by meeting with one such drug dealer — who was then represented by another lawyer — to discuss ongoing federal investigations and criminal prosecutions, by agreeing to assist with the drug dealer's legal expenses, and by directing the drug dealer "to meet with federal law enforcement officers and federal prosecutors . . . but to only tell them what they already knew rather than

---

[3] The attempted obstruction offenses charged in Counts Four, Nine, and Eleven were alleged as violations of § 1512(c)(2) of Title 18, which makes it unlawful to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so[.]"

5

sharing all information known to [that member] about the [Organization's] drug conspiracy and money laundering conspiracy." *See* J.A. 33, 35.[4]

Counts Eight and Ten alleged offenses of attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(3).[5] As relevant here, Count Eight charged that Farrell contravened § 1512(b)(3) by engaging in the activities that formed the bases for Count Nine, that is, by meeting with a Nicka Organization drug dealer he did not represent to discuss the drug dealer's criminal case, by agreeing to obtain funds for the drug dealer's legal fees, and by directing the drug dealer — in his cooperation with the federal authorities — to withhold relevant information. Count Eight further alleged that Farrell's conduct was an illegal effort to corruptly persuade the Organization drug dealer to withhold relevant information from the federal authorities that related to Organization members.

---

[4] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[5] The attempted witness tampering offenses charged in Counts Eight and Ten were alleged as violations of § 1512(b)(3) of Title 18, which provides penalties for:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> . . . .
>
> > (3) hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense . . . .

B.

During the post-indictment period leading to Farrell's trial, he moved the district court for suppression of his inculpatory recorded conversations with two Nicka Organization drug dealers: Jacob Harryman and Ryan Forman (hereinafter, the "Tapes"). In cooperating with federal agents, Harryman and Forman met separately with Farrell on several undercover occasions and taped their conversations with him. Farrell asserted in his suppression motion that the Tapes should be suppressed because they constituted attorney-client communications intercepted by the government in violation of the Sixth Amendment.[6]

On January 10, 2017 — the first day of trial — the district court orally denied Farrell's suppression motion. In explaining its bench ruling, the court questioned whether either Harryman or Forman — who were then cooperating witnesses of the government — had attorney-client relationships with Farrell when the Tapes were made. Assuming one or both of such relationships existed, however, the court recognized that the asserted privilege belongs to the clients, who could waive it and divulge otherwise privileged statements. The court then ruled that the federal agents were entitled to direct Harryman and Forman — in their cooperation with the federal authorities — to meet in undercover settings with Farrell and record their conversations without running afoul of the Sixth Amendment. After the court's denial of the suppression motion, the trial began.

---

[6] Farrell also contended in the district court that the Tapes should be suppressed because they were made and obtained in violation of the Fourth Amendment. On appeal, Farrell does not pursue the Fourth Amendment issue.

C.

During Farrell's fourteen-day trial, the prosecution called more than thirty witnesses, and the defense called several of its own. The prosecution witnesses included state and federal law enforcement officers who had investigated the Nicka Organization, former Organization drug dealers who were cooperating with the government, lawyers who represented cooperating witnesses, and federal agents who had examined and analyzed Farrell's records.

The trial evidence established the sophisticated nature of the Nicka Organization, which involved at least fifteen coconspirators and collected millions of dollars — over a period of at least six years — from marijuana sales in multiple states. The evidence showed that Farrell functioned as an illegal "consigliere" of the Organization and as a "fixer" and adviser to its organizer and drug kingpin, Matt Nicka.[7] From Farrell's role in the Organization, he received more than $100,000 from marijuana sales made by the Organization's drug dealers. He then utilized those drug proceeds to fund legal fees for the members and drug dealers and to support an incarcerated Organization member. In

---

[7] In summarizing the trial evidence against Farrell, the trial court described him as the "consigliere" of the Nicka Organization. *See* J.A. 3312. A "consigliere" has been defined as "an adviser, esp[ecially] to a crime boss," and may sometimes be called a "fixer." *See, e.g.*, The New Oxford American Dictionary 363 (2d ed. 2005). A "fixer" has been described as "a person who makes arrangements for other people, esp[ecially] of an illicit or devious kind." *See id.* at 637. A consigliere or fixer assists and conspires with a "drug kingpin," who is "[a]n organizer, leader, manager, financier, or supervisor of a drug conspiracy; [or] a person who has great authority in running an illegal drug operation." Black's Law Dictionary (10th ed. 2014).

the course of receiving and distributing those unlawful proceeds, Farrell falsified his client transaction records and misrepresented the source of those funds. Although Farrell was involved in assisting Nicka and the Organization by seeking to maintain what he called a "collapsed defense," he was never a lawyer of record for Nicka or any Organization drug dealer in the Maryland prosecutions. *See* J.A. 756.

Farrell's statements on the Tapes constituted the most compelling and damning trial evidence against him.[8] The Tapes established beyond peradventure that Farrell knew the details of the illicit drug trafficking business of the Nicka Organization. In fact, the Tapes revealed Farrell's specific knowledge and recognition that he was "at risk" because he was the consigliere of the Organization. *See* J.A. 3041-42. The Tapes also proved that Farrell sought to obstruct the federal investigations and prosecutions of Organization drug dealers by forging and filing affidavits, and by attempting to persuade the Organization's members and drug dealers to withhold relevant information from the federal authorities.[9] We will summarize with some specificity the trial evidence, reciting

---

[8] The government introduced into evidence the actual Tapes of the various undercover conversations with Farrell. In addition, the prosecutors filed transcripts of those conversations.

[9] The trial evidence against Farrell is consistent with a well-known expert's description of how drug trafficking organizations and their lawyers generally operate. That law professor extensively studied and analyzed the workings of such organizations. He then explained the relationships between drug kingpins, their drug dealers, and their drug organization lawyers as follows:

> [D]rug rings generally operate in a hierarchical structure with the boss at the top and the drug carriers — or "mules" as they are called — at the bottom. Naturally, it is the mules who take the greatest risk and who, in

(Continued)

9

it — as we must — in the light most favorable to the prosecution. *See United States v. Hassan*, 742 F.3d 104, 115 (4th Cir. 2014).

---

> fact, are most often arrested. They generally do not have the funds to retain able lawyers. It is often part of the deal that if they are caught, the boss will provide lawyers for them. . . . The bosses have an interest in assuring that their own lawyers — lawyers they are paying — are representing the mules. The last thing the boss wants is for an independent lawyer — or worse, a lawyer friendly to the prosecutors — to encourage the mules to buy their freedom in exchange for turning in the boss. Part of the mule's job is to be "a stand-up guy" — to "take the heat and do his time" without informing on the boss.
>
> The boss, in turn, has a stake in assuring his mules the best possible representation consistent with that understanding. A good lawyer will raise the odds that the mules will be acquitted, or if convicted, will get a light sentence. If the mules were to get long sentences, their incentive to sell out the boss would increase. Thus, a smart boss will generally try to retain the best possible lawyers for his mules. But he will try to get lawyers who will urge the mules to "fight rather than switch" allegiances.
>
> . . . .
>
> Certain kinds of "drug lawyers" invite this nightmare more than others. They represent the same drug dealers on a continuing basis. *They become the dealer's lawyer in much the same way that a Wall Street lawyer may become "house counsel" to a corporation (or the way a "consigliere" may become a legal advisor to an organized crime family).* They give advice about ongoing transactions; their business cards and home phone numbers are given to the mules in the event of an arrest; they are "on call" any time a problem arises; they socialize and become friendly with the dealers . . . . Though certain practices are unquestionably illegal, the line between proper representation of a drug dealer and improper participation in his business is not always a clear one. . . . Many of the specialists [in such representation] clearly remain on the proper side of the line; some play close to the edges; a few cross over and become part of the [illegal] business. The temptations are great because the profits are enormous. But so are the risks.

Alan M. Dershowitz, *The Best Defense*, 398-400 (1982) (emphasis added).

10

1.

In the initial aspect of the trial, the government called several law enforcement officers who had been involved in investigating the Nicka Organization and its illicit conduct over the years. The evidence revealed, inter alia, that a search warrant was executed in March 2009 at a suspected stash house in Baltimore that was being used by a major marijuana trafficking conspiracy. The stash house contained several large cardboard boxes of marijuana, ledgers reflecting more than fourteen million dollars in marijuana sales, thousands of dollars in cash, and approximately thirty cell phones, one of which listed Farrell as a contact. This drug trafficking evidence was seized, and the investigation confirmed that the stash house was used by the Organization.

In December 2010, an indictment was returned in the District of Maryland charging Nicka and twelve other drug dealers of the Organization with conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana.[10] That indictment did not name Farrell as a defendant. As related above, Farrell was indicted about five years later, in 2015, and tried in 2017.

---

[10] In May 2012, the superseding and operative indictment against Nicka and certain Organization members was returned by the grand jury. It charged Nicka and several Organization drug dealers with conspiracy to distribute and possess with intent to distribute marijuana, distributing and possessing with intent to distribute marijuana, money laundering conspiracy, money laundering, and maintaining drug premises. The prosecutions of Nicka and the Organization drug dealers spanned a period of several years, with many of the dealers pleading guilty to federal offenses. Nicka was himself a fugitive in Canada until his arrest in August 2013. In January 2016, he pleaded guilty to conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, plus money laundering conspiracy. Nicka was sentenced to 188 months in prison.

2.

After establishing before the jury the nature and background of the Nicka Organization, the government called several cooperating witnesses who had been drug dealers therein, several of whom had been prosecuted earlier. It also called as witnesses three lawyers who had represented drug dealers in the earlier prosecutions and who had interacted with Farrell during those representations.

a.

Andrew Sharpeta, an Organization drug dealer who packaged marijuana and kept financial ledgers for the Organization, confirmed that Nicka himself had consistently collected drug proceeds from its members that were reserved and used as a fund to hire defense lawyers for those "who got in trouble" (hereinafter, the "defense fund"). *See* J.A. 385. For example, around December 2009, Sharpeta — acting on Nicka's instructions — connected Farrell with Organization member Joseph Spain. Spain had received a federal grand jury subpoena in relation to a federal investigation of the Organization and took advantage of Nicka's promise of legal representation for those in trouble. Sharpeta thereafter listened in on a phone call between Nicka and Farrell, during which Farrell gave Nicka information about what Spain had told the grand jury and what Spain was planning to tell the federal authorities. Because Spain had mentioned Sharpeta to the grand jury, Farrell advised Nicka that "it would be in [Sharpeta's] best interest if [he] took a vacation somewhere." *Id.* at 366.

b.

Next, Amy Mitchell and Adam Constantinides testified about their interactions with Farrell during their involvement with the Nicka Organization. Constantinides had sold large quantities of marijuana for the Organization, and Mitchell was Constantinides's girlfriend and an Organization member. After the stash house raid in March 2009, Constantinides and Mitchell were short on cash. Another drug dealer in the Organization put them in touch with Farrell. Farrell — whom neither Constantinides nor Mitchell had ever met — then conferred with them and gave them $500 in cash. Soon thereafter, Constantinides received in the mail a magazine containing $9000 of hidden cash.

Mitchell related that, in October 2010, she was subpoenaed to the federal grand jury in Maryland investigating the Nicka Organization. She called Farrell, who advised her that the Organization's drug dealers were not cooperating with the federal authorities. Mitchell then met with Farrell at his Philadelphia office, where he gave Mitchell $100 for expenses and referred her to an attorney named Brown. When Mitchell inquired about paying lawyer Brown for his legal services, Farrell responded that "everything will be taken care of." *See* J.A. 550. Farrell then advised Mitchell that if she married Constantinides, they would not need to testify against each other. Mitchell was then represented by Brown, but did not pay him for any legal services. She married Constantinides in November 2010, after her discussion with Farrell and before her grand jury appearance.

13

Adam Constantinides explained that, in April 2011, he was arrested on a state charge and — like Mitchell — knew to call Farrell. After that phone call, a lawyer named Tully represented Constantinides in connection with the state charge. Constantinides, however, never paid Tully for anything. Although Constantinides did not know how Tully came to represent him without charge, Tully's office manager explained that Farrell had paid for Constantinides's representation. More specifically, Tully received two checks from Farrell, one for $1250 in April 2011, and another for that same amount in June 2011.[11] The money that Farrell used to pay Tully came from the defense fund.

Warren Brown testified about his representation of Amy Mitchell. Farrell had called lawyer Brown about referring Mitchell to him. Farrell requested that Brown represent Mitchell and help her avoid testifying before the federal grand jury. Brown confirmed that he received two checks from Farrell, one for $1000 in October 2010, and another for $1500 in November 2010.[12] Although Farrell's financial records did not document the source of the $2500 that was paid to Brown, the money came from the defense fund. Farrell later mailed Brown a package containing a proposed motion to quash Mitchell's grand jury subpoena, along with supporting documents (including a draft affidavit for Brown's signature). Brown said it was unusual to receive such a

---

[11] Farrell's payments to Tully in April 2011 and June 2011 were the bases for the money laundering charges in Counts Five and Six.

[12] Farrell's payments to Brown in October 2010 and November 2010 formed the bases for the money laundering charges in Counts Two and Three.

package from another lawyer, and he did not use the proposed motion or related documents. In February 2011, Farrell asked Brown to represent another Nicka Organization drug dealer and promptly gave Brown $5000 in cash from the defense fund. Although Brown later advised Farrell that he could not represent that drug dealer, Farrell did not seek the return of the $5000.

On cross-examination, Farrell's counsel asked Brown if lawyers representing codefendants in a criminal conspiracy case commonly communicate with each other, a fact that Brown confirmed. On redirect examination, the prosecutor followed up by inquiring: "[W]hen there are lots of participants in a drug conspiracy, sometimes lawyers representing different members of the conspiracy communicate amongst each other. Is that right?" *See* J.A. 632. Brown responded in the affirmative. The prosecutor then asked Brown: "Do lawyers commonly communicate with the clients without the lawyers present?" *Id.* In response, Brown stated that a lawyer should not communicate directly with a criminal defendant or witness who is represented by another lawyer. He observed that it would be "a violation of the Code of Professional Responsibility, the rules of ethics" to do so. *Id.*

c.

Jacob Harryman, another Nicka Organization marijuana dealer who was cooperating with the United States Attorney, testified regarding his conversations with Farrell, two of which were among the undercover Tapes that Farrell had unsuccessfully sought to suppress. Harryman recounted that, in November 2010, he was arrested on state drug charges. Harryman was represented by a lawyer named Leonard Shapiro on

15

those charges. After being released on bond in December 2010, Harryman met with his marijuana supplier — another member of the Organization — outside of lawyer Shapiro's office. The drug supplier told Harryman that Shapiro had been paid $9000 from the defense fund on Harryman's behalf. The supplier encouraged Harryman to contact Farrell and assured Harryman that the Organization would — according to the supplier — pay Harryman's legal fees.

Shortly thereafter, Harryman began cooperating with the local authorities in Baltimore. As part of his cooperation with those authorities, Harryman met with Farrell on January 13, 2011, in Farrell's Philadelphia law office. Farrell knew at that time that Harryman was represented by lawyer Shapiro, but did not know that Harryman was then cooperating with the Maryland authorities. During the meeting, Farrell told Harryman that his legal fees were "being taken care of," and Farrell explained what he called a "collapsed defense." *See* J.A. 756, 758. In conducting the collapsed defense, Farrell said, drug dealer coconspirators are to "stand[] strong" and "stick[] together." *Id.* at 756. Farrell warned Harryman that sticking with the collapsed defense was important, and would be much better than "someone coming to see [Harryman]." *Id*. at 757. Harryman took Farrell's statement about "someone coming to see [him]" to be an explicit threat of physical harm. About two weeks after that meeting, Harryman's drug supplier urged him to fire Shapiro. As the supplier explained to Harryman, lawyer Shapiro was not cooperating with Farrell.

About a month later, in February 2011, Harryman began cooperating with the federal authorities in Maryland. At the behest of federal agents, Harryman scheduled

16

another meeting with Farrell, ostensibly to discuss the seizure of some of Harryman's personal property by the DEA. On February 16, 2011, Harryman and Farrell met at a rest area on Interstate 95 in Maryland.[13] During their taped undercover conversation about the property seizures, Farrell asked Harryman whether he had any "legitimate[]" (i.e., not drug related) sources of revenue. *See* J.A. 823-24, 2994. Harryman and Farrell also discussed property the DEA had seized from Harryman, including an expensive wristwatch. Harryman told Farrell that the watch was a gift from his marijuana supplier, and Farrell responded, "well you can't really say who gave you that." *Id.* at 825-26, 2994. Farrell then explained that Harryman had to file an affidavit with the DEA with respect to each seized item that he sought to have returned. Farrell later filed affidavits with the DEA on Harryman's behalf that purportedly bore Harryman's signature. Harryman, however, had not signed any of the affidavits, nor authorized Farrell or anyone to sign his name.[14] The filing of the forged affidavits caused the DEA to forgo the administrative forfeiture of Harryman's seized property.[15]

---

[13] Farrell's conduct during and after the February 2011 meeting with Harryman on I-95 formed the basis for the attempted obstruction offense alleged in Count Four.

[14] Farrell's legal assistant confirmed that — at Farrell's direction — she notarized the Harryman affidavits by using another notary's credentials. Contributing to those suspicious circumstances, the legal assistant was not a notary, and Harryman was not present when she notarized the affidavits. Farrell had carried a blank DEA Seized Asset Claim Form to the I-95 meeting, which Harryman signed. Farrell's office manager then notarized and dated it.

[15] As explained at trial by a DEA representative, the timely filing of an affidavit contesting a seizure bars an immediate administrative forfeiture of the seized property. (Continued)

17

Lawyer Shapiro's evidence corroborated his client Harryman's account of the $9000 cash payment for Harryman's legal representation. In December 2010, Shapiro was informed by his assistant that the $9000 payment was left at his office. Shapiro believed that the money came from a Nicka Organization drug dealer, and not from his client Harryman. Shapiro therefore delivered the $9000 in cash to another lawyer who actually represented the other drug dealer. The day after Shapiro redelivered the $9000 cash payment, Farrell called for Shapiro, who was unavailable. Farrell had never called Shapiro before or since.

The prosecutor asked Shapiro whether it was his usual practice to pay another lawyer when referring a client. Shapiro answered that he would not do so. When the prosecutor inquired whether Shapiro had "ever paid another lawyer cash related to a case," Shapiro responded: "Not one time ever." *See* J.A. 1049.

d.

Michael Phillips, a former marijuana dealer for the Nicka Organization, also cooperated with the federal prosecutors and was a trial witness. When Phillips was arrested in Pennsylvania on state drug charges in 2009, Farrell appeared at the jail and sought to assist Phillips, even though Phillips had not contacted Farrell. Farrell represented Phillips in his Pennsylvania proceedings, but Phillips never paid for the

When such an affidavit is filed with the DEA, the forfeiture issue is referred to the United States Attorney.

18

representation.[16]   After Phillips pleaded guilty in state court and began serving his sentence, Farrell twice deposited money into his commissary account at the prison.

Phillips was released from state prison in November 2010, but was soon thereafter arrested on federal charges in Maryland.  Farrell attended Phillips's initial hearing on the federal charges but did not enter an appearance as counsel for Phillips.  While Phillips was in jail awaiting resolution of his federal case, another attorney, Todd Henry, arrived at the jail and offered to represent Phillips.  Phillips had not contacted Henry, but nevertheless accepted Henry's offer of legal representation.  Henry later told Phillips that Farrell had paid Henry's fees for representing Phillips.

Farrell also deposited money into Phillips's commissary account while he was in federal custody.  On at least four occasions in 2012, Farrell — or one of Farrell's employees acting at his direction — obtained money orders using cash from the defense fund and deposited them into Phillips's jail commissary account.  As pertinent here, Farrell deposited $100 in June 2012, plus another $150 in December 2012.[17]  Farrell also

---

[16] Although Phillips never paid Farrell for his services, Farrell's client transaction reports attributed more than $10,000 in cash deposits to Phillips for the period from January 2010 through April 2011.

[17] Farrell's deposits into Phillips's jail commissary account in June 2012 and December 2012 formed the bases for the money laundering charges in Counts Seven and Twelve.

gave cash money to a friend of Phillips for money orders that were deposited into Phillips's jail commissary account on other occasions.[18]

e.

Perhaps the government's most important trial witness was Ryan Forman, who had been a member of the Nicka Organization but later turned against the Organization and cooperated with the government. Forman had connected marijuana buyers with Nicka and purchased rental properties for Organization members by using drug trafficking proceeds. Forman also assisted Nicka and other Organization drug dealers in the purchase of an airplane that was used for the transportation of large amounts of marijuana.

In March 2009, a Nicka Organization drug dealer told Forman to call Farrell if he ever needed counsel and gave him Farrell's business card. About three months later, in June 2009, Forman received a grand jury subpoena and contacted Farrell. Forman soon met with Farrell to discuss the subpoena, but they never discussed payment for Farrell's legal services. Those events confirmed Forman's understanding — from his prior conversations with Matt Nicka — that he would not have to pay Farrell. Indeed, the only exchange between Forman and Farrell that resembled a payment of fees occurred in May 2011, when — at Farrell's request — Forman wrote Farrell a check for $10,000 and promptly exchanged the check for a $10,000 cash payment from Farrell. Farrell told

_____

[18] At trial, Farrell's office manager established that Farrell had also deposited money into other clients' commissary accounts while they were incarcerated.

20

Forman that the transaction was made "[s]o it could show on the books that [Farrell had] been paid." *See* J.A. 1749. Although records of several cash deposits appeared in Farrell's client transaction records under Forman's name, Forman never made any cash payments to Farrell.[19]

Although Farrell continued to meet with Forman on a monthly basis after Forman was subpoenaed, Forman said that Farrell kept Nicka in the loop and fully advised. On at least one occasion, Farrell put Nicka on a speakerphone so that the three men (Farrell, Nicka, and Forman) could discuss Forman's grand jury subpoena in the federal investigation of the Nicka Organization. About the same time, Farrell admitted to Forman that he kept in touch with all of the Organization suppliers and drug dealers who had been indicted — as well as their attorneys — and that his role was to "protect the family, the group of us," referring to the indicted and unindicted conspirators in the Organization. *See* J.A. 1744.

After Forman was arrested on federal charges in May 2012, he retained a new lawyer, Joseph Murtha. Forman personally paid Murtha, who acted independently of Farrell and the Nicka Organization and solely on behalf of Forman. Forman soon agreed to cooperate with United States Attorney Rosenstein and, as part of that agreement,

---

[19] Farrell's client transaction reports reflected that more than $20,000 in cash was paid by Forman to Farrell between June 2009 and September 2010. Forman, however, never paid Farrell any money at all.

attended a proffer meeting with federal prosecutors and agents in June 2012.[20] The meeting was governed by his agreement with the United States Attorney, which provided that the information disclosed at the meeting by Forman would not be used against him in any criminal trial, provided he was completely truthful and candid, and did not "withhold[] material information." *See* J.A. 3056.

Forman thereafter agreed with the federal authorities to arrange an undercover meeting with Farrell in July 2012, which was recorded and later became part of the Tapes that Farrell unsuccessfully sought to suppress.[21] At that meeting, Farrell tried to obtain information from Forman about the discovery materials that lawyer Murtha had received from the prosecutors in connection with Murtha's representation of Forman. Farrell asserted to Forman that sharing the government's discovery materials with Farrell would benefit the Nicka Organization and its suppliers and drug dealers. Farrell also advised Forman that, in a proffer meeting Forman was to have with the federal agents, he should not provide any new information to them. Rather than provide new information, Forman should "get the information of their questions." *See* J.A. 3034. According to the tape, Farrell instructed Forman to "only go into a proffer [meeting] prepared enough to give

---

[20] As explained to the jury by lawyer-witnesses, during a proffer meeting, the prosecutors and agents interview a prospective witness concerning an ongoing investigation. Such a meeting is generally subject to an agreement that protects the witness if he is fully cooperative and truthful.

[21] Farrell's conduct during the July 2012 recorded meeting with Forman was the basis for the attempted tampering charges in Counts Eight and Nine.

22

them nothing more than what they already know." *Id.* at 3039. He then added, "I've been preparing you all along, kind of, okay?" *Id*. at 3044.

During the July 2012 taped meeting between Forman and Farrell, Farrell repeatedly admitted that he considered himself to be "at risk." *See* J.A. 3041-42. Farrell indicated that those risks arose from his involvement in the Nicka Organization. As the transcript recites, Farrell actually said to Forman, "you know I know everything" about the Organization. *Id.* at 3042. Farrell was worried that the federal investigators might examine the May 2011 check-for-cash, $10,000 transaction between Forman and Farrell. He predicted that Forman might be questioned on that topic: "If you go in, and [the federal agents] say okay, . . . did you ever . . . pay Farrell any money? Uh, yes I gave him [a] $10,000 check. Did he give you cash back for it?" *Id.* at 3041. Forman interrupted, "So I gotta just say no, I mean that's not even . . . a[n] on the table story." *Id.*

Farrell offered during the taped undercover meeting to obtain $25,000 from the defense fund for Forman's legal fees. Farrell followed up that offer with a prompt text message to Forman confirming that Farrell had received "a positive response" to his funding request (though he did not say from whom). *See* J.A. 1770. Near the end of July 2012, Forman met Farrell again. This undercover meeting was also recorded and is in evidence as part of the Tapes. Farrell delivered $19,800 in cash to Forman at that meeting. When Forman remarked that Matt Nicka had come through, Farrell responded in the affirmative, stating: "I mean he's a lot of things . . . [but] frankly he's a standup guy." *Id*. at 1771-72, 3050.

23

Lawyer Murtha's trial testimony corroborated Forman's account of their professional relationship and Forman's continuing cooperation with the federal authorities. As Murtha explained, Forman made his cooperation agreement with the United States Attorney in June 2012 and agreed to be completely truthful and candid with the federal agents. Murtha said that he always advised his clients to be completely truthful, candid, and forthright in proffer meetings, and not to withhold any information.

On cross-examination, Murtha confirmed "that one thing [a lawyer] cannot do is, you know, bring a client in to cooperate and tell them to lie. Right?" *See* J.A. 1679. Murtha emphasized that "both ethically and legally . . . you cannot do that." *Id.* The prosecutor later asked, "would you ever tell a client to withhold information when they went into the proffer [meeting]?" *Id.* at 1683. Murtha said "no," explaining that doing so would contravene the proffer agreement and would probably violate federal law and ethics rules, in that such omissions could well equate to lying. *Id.* When the prosecutor inquired whether Murtha would ever tell his client "to only tell the government what [it] already knows," Murtha emphatically responded with a "no." *Id.*

### 3.

In addition to the foregoing evidence describing the Nicka Organization, the earlier indictments and prosecutions, plus Farrell's relationship to those events, the government introduced evidence of Farrell's questionable and false recordkeeping. For example, IRS agent Timothy Greene explained his analysis of bank deposit records of Farrell's law firm bank account and a comparison to Farrell's client transaction reports. Greene said that, from 2009 to 2011, Farrell's client transaction reports attributed to

24

Organization drug dealers tens of thousands of dollars of cash deposits made into Farrell's bank account. Several of those drug dealer conspirators testified at Farrell's trial, however, that they had never paid him for legal services. Greene also described the lack of receipts in Farrell's receipt book for any such transactions. Greene explained that, in 2012, Farrell deposited more than $57,000 in cash into his law firm account without any corresponding client transaction reports.

4.

At the close of the government's case-in-chief, Farrell moved for judgment of acquittal on each of the twelve charges in the indictment, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. After argument, the acquittal motion was denied. The defense then called character witnesses and a couple of others, and the government called a rebuttal witness. Farrell — who did not testify — renewed his Rule 29 acquittal motion at the close of the evidence, and it was again denied.

Thereafter, the trial court instructed the jury in oral and written form. As part of those instructions, the court gave — over objection — a willful blindness instruction. That instruction advised the jury:

> In determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning the truth, for example, that the statement was false, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, mistaken[,] or reckless. If you find the defendant was aware of a high probability, for example, that the statement was false and that the defendant acted with deliberate disregard to the facts, you may find the defendant acted knowingly. However, if you

25

find that the defendant actually believed, for example, a statement was true, he may not be convicted.

*See* J.A. 2578-79.

On February 2, 2017 — the third and final day of the jury deliberations — the jury sent a note to the court, asking: "If after hours of conversation, we are unable to agree on a particular count or count[s], what happens?" (hereinafter, the "Jury Note"). *See* J.A. 2826. The court promptly sought the views of counsel on how it should respond to the Jury Note. The lawyers agreed that the jury had not indicated that it was deadlocked, and they did not dispute the court's characterization of the Jury Note as asking an "abstract" question. *Id.* The court suggested advising the jurors that they should "try to reach agreement if [they] can without giving up [their] conscientious views," and also suggested the jury be referred to pages 60 and 61 of the written instructions. *Id.* at 2828-29. Those pages addressed the general obligations of jurors in deliberating, such as "discuss[ing] and consider[ing] the evidence," and "reach[ing] an agreement" based thereon "if [they] can do so without violence to [their] own individual judgment[s]." *Id.* at 2602.

Farrell's lawyers objected to the trial court's reference to its earlier instructions, that is, pages 60 and 61 of the written instructions. The court, however, overruled Farrell's objection. It then gave the jury the following instruction in response to the Jury Note:

> [A]ll parties in a jury trial are hopeful that the jury will be able to reach unanimous verdicts and conclude the case and that's the goal of every party and every judge.

26

It is not unusual for jurors to not immediately call us around a particular verdict or verdicts. The whole process of jury deliberation is a deliberative process where you talk to each other, you consider each other's views, you respect those views and there are [sic] some general commentary about that process on pages 60 and 61 of your jury instructions. But it basically means that you're supposed to be respectful of each other, listen to each other's views and see if you can reach a verdict without violating your conscience and if your conscience would be violated by a verdict that you don't like, then you don't vote for it.

*See* J.A. 2840.

The jury returned its verdict later that same day, and found Farrell guilty on Counts One through Nine, plus Count Twelve. It acquitted him, however, on Counts Ten and Eleven.

5.

On March 2, 2017, Farrell filed a post-trial motion for judgment of acquittal and also moved for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure. On October 7, 2017, the district court heard argument on those motions and denied each of them. During that hearing, the court varied downward from the advisory Guidelines range and sentenced Farrell to 42 months in prison.[22] Farrell has timely appealed the criminal judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[22] The district court calculated Farrell's advisory Guidelines range as 97 to 121 months. It then varied downward and imposed a 42-month sentence. On appeal, Farrell does not contest his sentence.

II.

On appeal, Farrell pursues five challenges to his convictions. First, Farrell contends that the district court erred in denying his motion to suppress the Tapes. Second, Farrell attacks the sufficiency of the evidence as to each of his ten convictions. Third, Farrell argues that the court abused its discretion in admitting certain evidence from the lawyer-witnesses. Fourth, Farrell maintains that the court abused its discretion in giving the willful blindness instruction. Finally, he asserts that the court erred in its handling of the Jury Note by providing an unduly coercive instruction. We assess those contentions in turn.

III.

A.

Farrell first challenges the district court's denial of his motion to suppress the Tapes, which contain inculpatory recorded statements that Farrell made to cooperating witnesses Harryman and Forman. In assessing a district court's denial of a suppression motion, we review the court's "conclusions of law de novo and underlying factual findings for clear error." *United States v. Clarke*, 842 F.3d 288, 293 (4th Cir. 2016) (internal quotation marks omitted). When the court has denied a suppression motion, "we construe the evidence in the light most favorable to the government." *Id*. (internal quotation marks omitted).

According to Farrell, the district court erred in denying his suppression motion because the government's surreptitious recording of his conversations with Harryman and

28

Forman ran afoul of the Sixth Amendment by invading attorney-client relationships and the corresponding privilege. That is, Farrell claims that his communications with Harryman and Forman are protected by attorney-client privilege and that he can invoke that privilege. We reject that aspect of Farrell's suppression contention, however, because it is neither factually nor legally correct.

The record does not show that, at the time of the undercover recordings, Harryman and Forman were Farrell's clients or sought to become his clients. To the contrary, when the recordings were made, Harryman and Forman had both hired separate and independent lawyers to represent them — as Farrell was well aware. Therefore, no attorney-client relationship existed to support Farrell's claim. *See, e.g.*, *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997) (describing considerations to assess whether attorney-client privilege exists, including whether "the asserted holder of the privilege is or sought to become a client").[23]

---

[23] For support of this contention, Farrell relies on the First Circuit's decision in *United States v. Novak*, 531 F.3d 99 (1st Cir. 2008). In that case, the government recorded telephone calls between a pretrial detainee and his lawyer, Novak, with the pretrial detainee's permission. *See id.* at 100. When the government later prosecuted Novak, he moved to suppress incriminating statements that he had made to his client because they were recorded in violation of the Fourth Amendment. *See id.* at 101. The First Circuit reversed the district court's decision to grant the suppression motion, concluding that there was no Fourth Amendment violation because the detainee had consented to his calls to Novak being monitored. *See id.* at 103-04. Although the First Circuit said that monitoring a detainee's calls to his attorney "presents a significant Sixth Amendment issue," it did not address that issue. *See id.* at 102, 104. Notably, *Novak* is distinguishable from this case because neither Harryman nor Forman had an attorney-client relationship — or was seeking to form such a relationship — when the taped conversations occurred.

Additionally, as the district court explained, "in the attorney[-]client privilege context, the privilege belong[s] to the client, not the lawyer." *See* J.A. 203-04. Accordingly, Harryman and Forman were entitled to waive any such privilege, if one had existed at the time of their taped conversations with Farrell. *See Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998) (observing that client holds attorney-client privilege and "can waive it either expressly, or through conduct" (internal quotation marks omitted)). We are therefore satisfied that the trial court did not err in denying Farrell's motion to suppress the Tapes.

### B.

Farrell then challenges the district court's denial of his requests for judgments of acquittal, which were predicated on a lack of evidence supporting the offenses of conviction. We review de novo "the district court's denial of a motion for acquittal based on sufficiency of the evidence." *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017). As we have emphasized, "[t]he standard for reversing a jury verdict of guilty is a high one: the Court does so only where the prosecution's failure is clear." *United States v. Perry*, 757 F.3d 166, 175 (4th Cir. 2014) (internal quotation marks omitted). That is, "[t]he jury's verdict *must be upheld* on appeal if there is substantial evidence in the record to support it." *Id.* (internal quotation marks omitted). We have defined substantial evidence as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). In evaluating an issue of evidence sufficiency, "we view the evidence and the reasonable inferences to be drawn therefrom in the light most

30

favorable to the [g]overnment." *United States v. McNeal*, 818 F.3d 141, 148 (4th Cir. 2016) (internal quotation marks omitted).

1.

a.

Farrell asserts that there was insufficient trial evidence to support his convictions for money laundering conspiracy (Count One), and for the six substantive money laundering offenses (Counts Two, Three, Five, Six, Seven, and Twelve), and that those seven convictions should thus be vacated and dismissed with prejudice. Count One alleged, inter alia, that from 2009 to 2013, Farrell was involved in a money laundering conspiracy in the District of Maryland and elsewhere that conducted financial transactions relating to monetary proceeds from the unlawful activity of marijuana trafficking, which transactions were used to conceal and disguise the illegal source of such proceeds, in violation of 18 U.S.C. § 1956(h). The offenses alleged in Counts Two, Three, Five, Six, Seven, and Twelve were substantive money laundering offenses, and charged what is known as "concealment money laundering" under 18 U.S.C. § 1956(a)(1)(B)(i). Counts Two and Three related to Farrell's payments to lawyer Brown (to represent Mitchell) in October 2010 and November 2010. Counts Five and Six concerned similar payments from Farrell to lawyer Tully (to represent Constantinides) in April 2011 and June 2011. Counts Seven and Twelve were predicated on Farrell's deposits of funds into drug dealer Michael Phillips's jail commissary account in June 2012 and December 2012.

31

To convict on a money laundering conspiracy charge, in contravention of § 1956(h) of Title 18, the government must prove three elements:

> (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C § 1956(a);
>
> (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and
>
> (3) that the defendant knowingly and voluntarily became part of the conspiracy.

*See United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010).

Section 1956(a)(1) of Title 18 makes several forms of money laundering illegal. *See United States v. Bolden*, 325 F.3d 471, 486-87 (4th Cir. 2003). As relevant here, the statute prohibits concealment money laundering. *Id.*; *see* 18 U.S.C. § 1956(a)(1)(B)(i). To obtain a conviction on the concealment money laundering offenses alleged in the six substantive counts being challenged, the government was obliged to prove four elements:

> (1) that the defendant conducted or attempted to conduct a financial transaction having at least a *de minimis* effect on interstate commerce or involving the use of a financial institution which is engaged in, or the activities of which have at least a *de minimis* effect on, interstate commerce;
>
> (2) that the property that was the subject of the transaction involved the proceeds of specified unlawful activity;
>
> (3) that the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and
>
> (4) that the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity.

*See United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998) (citation omitted).

b.

With the legal underpinning of money laundering so understood, we turn now to Farrell's conviction for the money laundering conspiracy, as alleged in Count One. Farrell maintains that the government's evidence was inadequate to support his conspiracy conviction. Put succinctly, however, the evidence proved that Farrell was intimately involved in the unlawful activity of Nicka and the Organization and that each of the elements of the alleged money laundering offenses were satisfied. Indeed, Farrell's involvement included the following:

- That from at least 2009 to 2012, Farrell received thousands of dollars in cash from Nicka and the Organization;[24]

- Farrell obtained and distributed cash from the defense fund created and controlled by Nicka — and funded by the Organization's drug dealers — for use in defending Nicka and the Organization and seeking to maintain the Organization's collapsed defense;

- As the Tapes reveal, Farrell knew "everything" about the Nicka Organization, including that Nicka and the Organization's drug dealers made large sums of cash money from marijuana trafficking;

- That Farrell falsified his law firm's financial records regarding its receipt of defense fund cash from Nicka and the Organization;

---

[24] The criminal nature of Farrell's ongoing activities in assisting Nicka and the Organization's drug dealers was supported and shown by their use of large sums of cash money. As we know beyond peradventure, drug trafficking and large sums of cash go together. *See In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 474 n.32 (E.D. Va. 1994) ("Courts have frequently remarked on the fact th[at] large sums of cash and drugs frequently go together."); *see also United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990) (explaining that "unusually large amounts of cash" constitute evidence of drug trafficking offenses); *United States v. $95,945.18, United States Currency*, 913 F.2d 1106, 1111 (4th Cir. 1990) (recognizing that drug trafficking could be proven, inter alia, by possession of large sums of cash).

- Farrell advised Forman that he maintained constant contact with the Organization's drug dealers who had been prosecuted in the Maryland federal case, as well as their lawyers;

- Farrell explained to Forman that his role with Nicka and the Organization was to "protect the family, the group of us," referring to the Organization coconspirators;

- Farrell advised Organization drug dealer Sharpeta that he should take "a vacation somewhere" because Sharpeta's name had been mentioned to the federal grand jury investigating the Organization;

- At the direction of an Organization member, Mitchell and Constantinides travelled from Annapolis to Farrell's Philadelphia office, where Farrell — who had never met those drug dealers — gave them cash;

- Farrell used the defense fund to pay lawyer Brown $2500 to represent Amy Mitchell and asked Brown to keep her from testifying before the federal grand jury;

- Farrell thereafter obtained money from the defense fund to pay Brown another $5000 and asked Brown to represent an Organization drug dealer;

- Farrell paid lawyer Tully $2500 from the defense fund to represent Constantinides;

- That Farrell told drug dealer Harryman that his legal fees were "being taken care of," after Harryman's lawyer had received $9000;

- That Farrell threatened Harryman and directed that he adhere to the collapsed defense of the Organization, in order to protect Nicka and the Organization;

- That Farrell used defense fund cash to purchase money orders and then deposited them into Phillips's jail commissary account;

- Farrell paid lawyer Henry to represent Organization drug dealer Phillips;

- That Farrell directed drug dealer Forman to write a check to Farrell for $10,000 and exchange the check with Farrell for $10,000 in cash, in order that Farrell could falsely "show on the books" that he had been paid by Forman; and

- That Farrell received $19,800 in defense fund cash from Nicka and the Organization and delivered that cash to Forman for legal fees.

On this record, we are entirely satisfied that Farrell's conviction on Count One is sufficiently supported. Farrell also asserts, however, that his conduct in this case is not criminal because it is no different than the actions of other lawyers in advising organizational clients. In that regard, we emphasize that, because drug trafficking is an "unlawful activity" with respect to money laundering and RICO offenses (*see* 18 U.S.C. § 1956(c)(7)), a lawyer providing advice to an unlawful drug trafficking entity such as the Nicka Organization places himself at great personal risk. Any lawyer providing advice concerning ongoing unlawful activity is circumscribed in the legal advice that can permissibly be provided, lest he become a participant in the unlawful activity. That is, a lawyer representing or advising such an entity can readily turn himself into a coconspirator — or aider and abettor — in the form of a consigliere or fixer. In all likelihood, the lawyer could with propriety advise the drug kingpin of the unlawful entity thusly: to immediately cease all unlawful drug trafficking activities. In the vernacular, the drug kingpin could be advised that all such activities should be immediately "shut down."[25]

---

[25] A lawyer faced with circumstances such as these might legitimately also advise a drug kingpin that he should never speak of his unlawful activities after they cease. In sum, the aggregate of legitimate advice should likely be no more than "shut down and (Continued)

But as the trial evidence proves, Farrell went well beyond such circumscribed advice and took steps to extensively involve himself in the alleged offenses. *See supra* at 33-35 (identifying at least seventeen instances of Farrell's involvement in the money laundering offenses); *see also* Dershowitz, *supra* note 9, at 400 ("A law degree is not a license to join criminal enterprises."). Indeed, by his involvement therein, Farrell crossed the line and became "part of" the Nicka Organization itself, as its consigliere and fixer. *See* Dershowitz, *supra* note 9, at 400. And Farrell performed his roles as consigliere and fixer in multiple ways, including, inter alia, (1) receiving large sums of cash from the defense fund, which he then knew to be derived from and subsidized by marijuana trafficking proceeds; (2) obtaining lawyers for Organization drug dealers by use of defense fund money at Nicka's behest; and (3) encouraging — even threatening — those drug dealers to be "stand-up guy[s]" for his "collapsed defense" of Nicka and the

---

clam up." Any involvement in the unlawful activity by the lawyer, however, will readily place him in criminal peril. That is, other conduct in dealing with the kingpin of a drug trafficking unlawful activity could be perceived as conspiring to commit money laundering or other offenses. *See Hassan*, 742 F.3d at 146 ("A person intending to only be 'in for a penny,' with the slightest connection to an established conspiracy, actually risks being 'in for a pound.'"). The lawyer could also be deemed by the authorities as aiding, abetting, counseling, inducing, or procuring such offenses, and thus risk substantive criminal charges. *See* 18 U.S.C. § 2; *see also* Model Rules of Prof'l Responsibility r. 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ."); *id.* r. 1.16(a)(1) (requiring a lawyer to decline representation of a potential client or to withdraw from such representation where "representation will result in violation of the rules of professional conduct or other law").

Organization. *See id.* at 398-99. In these circumstances, we readily reject Farrell's evidence sufficiency challenge to his money laundering conspiracy conviction. [26]

c.

Turning to the substantive money laundering offenses, Farrell contends that each of his four convictions for payments of fees to other attorneys (Counts Two, Three, Five, and Six) should be vacated because the trial evidence failed to show that he ever sought to conceal those payments. In addition, Farrell asserts that his convictions for the commissary deposits in Counts Seven and Twelve are fatally infirm for three reasons: (1) the evidence failed to prove that he knew those funds were derived from an illegal source; (2) there was no evidence that he ever sought to conceal the nature of the

---

[26] Our good friend Judge Thacker appears to misapprehend one aspect of our discussion about the advice a lawyer in Farrell's circumstances could legitimately provide. *See post* at 53 ("In my view, a lawyer representing a client charged with drug trafficking generally does not 'place[] himself at great personal risk,' and is not 'circumscribed in the legal advice that can permissibly be provided.'"). Her comments, however, enable us to further emphasize the distinction between a wayward lawyer — who becomes criminally entangled with his client's ongoing illegal activities — and the honest lawyer called upon to represent persons charged with criminal offenses. Our discussion illustrates that contrast and delineates the permissible boundaries for a lawyer advising a client who is involved in ongoing unlawful activities. *See supra* at 35 ("[A] lawyer providing advice to an *unlawful drug trafficking entity* such as the Nicka Organization places himself at great personal risk. Any lawyer providing advice concerning *ongoing unlawful activity* is circumscribed in the legal advice that can permissibly be provided, lest he become a participant in the unlawful activity. . . . In all likelihood, the lawyer could with propriety advise *the drug kingpin of the unlawful entity* thusly: to immediately cease all unlawful drug trafficking activities." (emphases added)); *supra* note 25 ("A lawyer faced with *circumstances such as these* might legitimately also advise *a drug kingpin* that he should never speak of his unlawful activities after they cease." (emphases added)). We do not address or criticize the conduct of lawyers representing persons suspected or accused of past (as opposed to ongoing) wrongdoing.

37

proceeds underlying the commissary deposits; and (3) the evidence proved that he made similar payments to other clients with his own money.

On the money laundering convictions concerning Farrell's payments to other lawyers, his concealment argument misapprehends the government's money laundering theory and the evidence supporting it. The government's theory was not that Farrell laundered money by attempting to conceal his defense fund payments to other attorneys. Instead, it was that Farrell knew that openly paying the lawyers (rather than having Nicka or another Organization drug dealer pay them) was done that way to conceal and disguise the fact that the money was the illegal proceeds of marijuana trafficking. *See United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992) (explaining that "[t]he [g]overnment need not prove that the defendant had the *purpose* of concealing the proceeds of illegal activity," rather, the government must prove that "the defendant possessed the *knowledge* that the transaction was designed to conceal illegal proceeds"). Consequently, a controlling factual issue was whether Farrell knew that the money he deposited into his firm bank account and used to pay the lawyers came from an illegal source. If so, the jury was entitled to reasonably infer that Farrell's transactions with those defense funds — by paying other lawyers — were designed to conceal and disguise the provenance of the funds.

There was substantial evidence that Farrell knew that the money he deposited into his firm bank account was derived from the illegal source of drug trafficking, that is, the defense fund. As related above, the government proved that Nicka made his money entirely from marijuana sales, that Farrell received large sums of cash from Nicka, and

38

that Farrell knew "everything" about the Nicka Organization. Significantly, Farrell also falsified his firm's accounting records concerning the defense funds he received, further proving his guilty knowledge of the illegal source of those funds. Farrell then conducted financial transactions (i.e., paying Brown and Tully by checks drawn on his firm account) to assist Nicka and the Organization in concealing and disguising the source of the defense funds used to pay those lawyers. Perhaps most damningly, Farrell acknowledged more than once on the Tapes that he knew he was "at risk," based on his role in those and other transactions. In these circumstances, we are satisfied that Farrell's convictions on Counts Two, Three, Five, and Six are supported by substantial evidence. *See United States v. Reed*, 167 F.3d 984, 986 (6th Cir. 1999) (affirming money laundering conspiracy conviction where the defendant lawyer "agreed to act as a conduit for the flow of money and information between" a marijuana supplier and a marijuana distributor).

Insofar as Farrell makes similar concealment assertions in challenging his convictions on the commissary deposit offenses (Counts Seven and Twelve), we reject those arguments as well. For example, the fact that Farrell deposited his own money into other inmates' commissary accounts on different occasions simply does not mandate us to vacate those convictions. The jury heard the evidence of Farrell's other commissary deposits and nevertheless saw fit to convict him on Counts Seven and Twelve. We will not disturb the verdict in that respect. *See United States v. Abbell*, 271 F.3d 1286, 1298 (11th Cir. 2001) (affirming money laundering conspiracy conviction of lawyer who deposited funds into commissary accounts of cartel leader's subordinates and who was thereafter reimbursed by cartel leader).

2.

Farrell next contends that there is insufficient evidence to support his convictions for attempted obstruction of official proceedings, in violation of 18 U.S.C. § 1512(c)(2), as charged in Counts Four and Nine. Count Four alleged that Farrell sought to corruptly obstruct, influence, and impede the DEA forfeiture proceedings concerning the seizure of Harryman's personal property, by advising Harryman not to disclose the source of his expensive wristwatch that was seized by the DEA, and by forging affidavits before filing them with the DEA. Count Nine charged that Farrell sought to corruptly obstruct, influence, and impede the Maryland federal court proceedings against Nicka Organization drug dealers by meeting with Forman to discuss the federal prosecutions, agreeing to obtain funds to support Forman's legal expenses, and directing Forman to only give the federal authorities at a proffer meeting such information that the authorities already knew.

Section 1512(c)(2) makes it unlawful to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." To act "corruptly" means to act wrongfully. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (explaining that "corruptly" means wrongfully); *United States v. Edlind*, 887 F.3d 166, 173 (4th Cir. 2018) (same); *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (observing that "corruptly" in § 1512(c)(2) means "wrongfully"). The statutory definition of an "official proceeding" includes "a proceeding before a judge or court of the United States," and "a proceeding before a Federal Government agency which is authorized by law." *See* 18 U.S.C. § 1515(a)(1)(A), (C).

40

Beginning with Count Four, Farrell maintains that his conduct in signing and sending the forged affidavits concerning Harryman's property to the DEA was not corrupt because all the information contained therein was accurate. He also contends that there was no indication that Harryman would not have signed the affidavits if he had been accorded an opportunity to do so. Put succinctly, the forging of Harryman's signature on the affidavits, and the submission of those false affidavits to the DEA, constituted wrongful and corrupt efforts to influence and impede the DEA forfeiture proceedings.[27] And Farrell succeeded in that effort, causing the DEA to forgo the administrative forfeiture of the seized property. That the information in the affidavits could have been accurate does not undermine the illegality of the forgeries. We are therefore satisfied that the evidence supports the Count Four conviction.

As to Count Nine, Farrell contends that he did not act corruptly in advising Forman about the proffer meeting because Farrell was not then aware that Forman had a proffer agreement with the government. In any event, he argues that a witness can limit the scope of his cooperation with the authorities. Farrell also maintains that he did not instruct Forman to lie or withhold information from the government.

We are unpersuaded by any of Farrell's contentions on Count Nine. Farrell's instruction to Forman that he should proffer to the authorities only the information that they already knew constitutes an instruction to lie to the federal agents. If the agents

---

[27] Farrell does not contest that the DEA forfeiture proceedings constituted "official proceeding[s]" within the meaning of § 1512(c)(2).

41

asked Forman for what he knew, and if Forman adhered to Farrell's advice, Forman would give false and incomplete information to them. At bottom, the jury was entitled to find that Farrell sought to corruptly obstruct, influence, or impede the Maryland criminal case against the Nicka Organization drug dealers by instructing Forman to withhold relevant information from the federal authorities. *See United States v. Mintmire*, 507 F.3d 1273, 1290-91 (11th Cir. 2007) (affirming § 1512(c)(2) conviction for attempted obstruction where lawyer coached witness to conceal truth from grand jury). Accordingly, we reject Farrell's evidence sufficiency challenge as to Count Nine.

3.

Farrell next maintains that there was insufficient evidence to convict him of the attempted witness tampering offense, in violation of 18 U.S.C. § 1512(b)(3), that is alleged in Count Eight. Farrell was charged therein with attempting to tamper with Forman, and that charge is based on the same criminal acts that support Count Nine, including — most significantly — by advising Forman to reveal in the proffer meeting only what the federal agents already knew about the Nicka Organization and its operations.

As pertinent here, § 1512(b)(3) prohibits "knowingly . . . corruptly persuad[ing] another person, or attempt[ing] to do so . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense." As the Supreme Court has explained, by using the terms "knowingly" and "corruptly" together,

42

that provision "limit[s] criminality to persuaders conscious of their wrongdoing." *See*

*Arthur Andersen LLP*, 544 U.S. at 706.

Farrell's challenge to his Count Eight conviction relies on the same contentions that he uses to contest his conviction on Count Nine. We therefore reject his arguments as to Count Eight for the very reasons specified above as to Count Nine. *See supra* Section III.B.2. Put simply, the evidence proved that Farrell knowingly sought to corruptly persuade Forman to withhold relevant information from federal officers during the proffer meeting. *See Edlind*, 887 F.3d at 174 (recognizing that "[a] defendant's directive to a witness to lie to investigators or at trial always suffices" to prove corrupt persuasion). Consequently, Farrell's conviction on Count Eight must be sustained.

## C.

### 1.

Farrell's next appellate contention relates to the admission of trial testimony given by lawyers Shapiro, Murtha, and Brown. We review a district court's evidentiary rulings for an abuse of discretion, and "we will only overturn [a] ruling that is arbitrary and irrational." *United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014). Farrell maintains that the trial court erred in allowing Shapiro, Murtha, and Brown to give lay opinions, authorized by Rule 701 of the Federal Rules of Evidence, that were really expert opinions admissible only under Rule 702 of those Rules.[28] According to Farrell, the government

---

[28] Farrell's contention on the lawyer testimony also relies on Rules 403 and 704 of the evidence Rules. We are satisfied, however, that those Rules did not mandate the trial court to exclude that evidence. *See* Fed. R. Evid. 403 (authorizing trial court to "exclude (Continued)

failed to qualify the lawyers as experts, and their challenged opinions should therefore

have been excluded. Farrell faults the admission of the following testimony:

- Lawyer Shapiro said that he had never paid another lawyer in cash related to a case;[29]

- Lawyer Murtha — an honest lawyer who conducted himself in an exemplary fashion — said that he would never tell a client to withhold information during a proffer meeting, because doing so would violate the proffer agreement and could violate federal law or ethics rules;

- Murtha also said that he would never instruct a client — in a proffer meeting — to tell the government only what it already knows; and

- Lawyer Brown said that it would contravene the ethics rules for a lawyer to communicate with a person who is then represented by counsel, in the absence of the lawyer and concerning the subject of the absent lawyer's representation.

Rule 701 concerns lay opinion evidence and authorizes a witness "not testifying as

an expert" to present opinion evidence that is "(a) rationally based on the witness's

perception; (b) helpful to clearly understanding the witness's testimony or to determining

a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge

within the scope of Rule 702." *See* Fed. R. Evid. 701. In contrast, Rule 702 deals with

---

relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"); Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.").

[29] Farrell also complains that another witness said before the jury that Shapiro had referred to Farrell as "dirty." *See* J.A. 784. Remedial action was promptly taken, however, and the trial court struck the testimony and instructed the jury to disregard it. That contention is thus also rejected.

expert opinions and provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if four requirements are satisfied. *See* Fed. R. Evid. 702.

Although we have recognized that "the line between lay opinion testimony under Rule 701 and expert testimony under Rule 702 is a fine one," the "guiding principle" in distinguishing lay from expert opinion is that lay testimony must "be based on personal knowledge." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (internal quotation marks omitted). Other factors we have identified for distinguishing lay testimony from expert opinion are: (1) whether the proposed testimony relies on "some specialized knowledge or skill or education that is not in the possession of the jurors," and (2) whether the proposed testimony is "in the form of responses to hypothetical or like questions." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (internal quotation marks omitted).

Our precedents concerning lay opinion are instructive with respect to the boundaries thereof. For example, we have approved the admission of the lay opinions of a coconspirator lawyer about a "conspiracy's fraudulent nature and illegality," because they were based on the lawyer's personal experience in the conspiracy. *See United States v. Offill*, 666 F.3d 168, 178 (4th Cir. 2011). We also approved a police officer's lay opinions under Rule 701 where the officer described his training on use of force tactics and the degree of force he would have used to subdue an arrestee. *See United States v. Perkins*, 470 F.3d 150, 153, 156 (4th Cir. 2006). In that decision, we reasoned that the

police officer could provide his lay opinions because he had witnessed the use of force at issue and possessed "particularized experience." *See id.* at 156.

2.

With the foregoing principles in mind, we evaluate the challenged testimony of the three lawyer-witnesses in this case. First, Farrell asserts that lawyer Shapiro presented an inadmissible lay opinion by stating that he has never paid another lawyer in cash that was related to a case. Put simply, however, that statement was not opinion testimony. It was fact testimony and was predicated on Shapiro's legal experience. As such, the trial court's ruling was not an abuse of discretion.

Farrell next challenges lawyer Murtha's testimony that he would never advise a client to withhold information during a proffer meeting because to do so would violate the proffer agreement and could violate federal law or ethics rules. In addition, Farrell maintains it was error to allow Murtha to testify that he would never instruct a client to only tell the government agents in such a proffer meeting that which they already know. We are satisfied that Murtha could testify under Rule 701 regarding the advice he generally gave to criminal clients in his law practice. *See Perkins*, 470 F.3d at 156; *cf. Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017) (concluding that business employee could give lay opinion regarding construction costs, based on knowledge gained from years of experience). Insofar as Murtha invoked federal law and legal ethics rules to explain why he would not advise a client to withhold information during a proffer meeting, those views were permissible lay opinions, and were similar to those we approved in our *Offill* decision. *See* 666 F.3d at 178 (permitting lawyer to

46

testify regarding illegality of conspiracy); *cf. United States v. Roe*, 606 F.3d 180, 183, 185-86 (4th Cir. 2010) (concluding that officer involved in firearms licensing could testify under Rule 701 regarding certifications and permits). The challenged portions of Murtha's testimony were therefore not erroneously admitted.

Finally, Farrell contests the trial court's admission of lawyer Brown's opinion that an attorney communicating with a represented party or witness — in the absence of the other lawyer and concerning the represented matter — contravenes legal ethics rules. Put succinctly, the court did not err in admitting this testimony because it was based on personal knowledge and on Brown's experience as a lawyer. *See Offill*, 666 F.3d at 178; *cf. Roe*, 606 F.3d at 185-86. Although Brown's evidence could approach the "fine" line between lay and expert opinion, *see Johnson*, 617 F.3d at 293, the court certainly did not act arbitrarily or irrationally in its ruling, *see Hassan*, 742 F.3d at 130.[30]

### D.

Farrell's final appellate contentions relate to jury instructions, that is, the willful blindness instruction and the supplemental instruction concerning the Jury Note. We review decisions on such instructions — and the contents thereof — for abuse of discretion. *See United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992). We will

---

[30] Even if we agreed with Farrell that the challenged aspects of Murtha's and Brown's testimony were erroneously admitted under Rule 701, the errors would be harmless because those witnesses could have qualified as experts "in the first instance." *See Perkins*, 470 F.3d at 156-57; *see also* J.A. 580-81 (describing Brown's legal experience); *id.* at 1653, 1668 (describing Murtha's legal experience).

first assess the willful blindness instruction and then evaluate Farrell's challenge to the trial court's handling of the Jury Note.

1.

Farrell contends that the district court fatally erred with respect to the willful blindness instruction. Farrell's argument focuses on the instruction as it relates to the money laundering conspiracy charge and the substantive money laundering charges. As spelled out above, for the jury to convict Farrell of those offenses, the government was required to prove, inter alia, that Farrell knew that the defense fund money he received from the Nicka Organization and distributed for legal services and commissary deposits came from an unlawful activity, i.e., the Organization's marijuana trafficking business. *See Green*, 599 F.3d at 371; *Wilkinson*, 137 F.3d at 221.

The knowledge elements of the money laundering conspiracy offense and the substantive money laundering offenses could be proved in two ways — by evidence of Farrell's subjective knowledge that the proceeds were derived from an unlawful source, or alternatively, by evidence that he made himself "deliberately ignorant" of that fact. *See United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017). The alternative method of proof has been called the willful blindness doctrine. We have summarized that doctrine as permitting the prosecution to "prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances." *See United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (internal quotation marks omitted); *see also United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991) (explaining that the willful blindness doctrine allows the

48

jury to use circumstantial evidence to "impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him").

We have observed that a proposed instruction concerning the willful blindness doctrine "should be handled with caution." *See Hale*, 857 F.3d at 168 (internal quotation marks omitted). It is only warranted "when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." *See id.* (internal quotation marks omitted). If the trial court errs in giving such an instruction, however, "we must assess whether such error is harmless." *See United States v. Lighty*, 616 F.3d 321, 378 (4th Cir. 2010). Such an error is harmless "where there is sufficient evidence in the record of actual knowledge on the defendant's part." *See id.* at 378-79; *see also United States v. Whittington*, 26 F.3d 456, 464 (4th Cir. 1994) (explaining that assumed error as to willful blindness instruction was harmless "given the overwhelming evidence of [the defendant's] guilt and the minor significance of the single paragraph willful blindness instruction in the context of the entire jury charge").

If we accept Farrell's position that the trial court abused its discretion in giving the willful blindness instruction, the error is harmless. That is, the evidence proved beyond peradventure Farrell's actual subjective knowledge that he had received and distributed defense fund proceeds from the Nicka Organization's unlawful drug trafficking activities. *See supra* Section III.B.1. In other words, the knowledge elements were readily proven by evidence of Farrell's actual knowledge as to each of the money laundering charges.

49

The court's willful blindness instruction thus does not entitle Farrell to any relief from his money laundering convictions.

2.

Finally, Farrell contends that the trial court's supplemental instruction with respect to the Jury Note constituted an impermissibly coercive "*Allen* charge" that led the jury to improperly convict him.[31]  More specifically, Farrell faults the court's instruction that it is "the goal of every party and every judge" that the "jury will be able to reach unanimous verdicts and conclude the case."  *See* J.A. 2840.  An "*Allen* charge" — so-called for its origins in the Supreme Court's nineteenth century decision in *Allen v. United States*, 164 U.S. 492 (1896) — is "a supplemental instruction given by a trial court when the jury has reached an impasse in its deliberations and is unable to reach a consensus."  *See United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015).  Typically, an *Allen* charge advises "deadlocked jurors to have deference to each other's views, [and] that they should listen, with a disposition to be convinced, to each other's argument."  *See United States v. Seeright*, 978 F.2d 842, 845 n.* (4th Cir. 1992) (quoting Black's Law Dictionary 74 (6th ed. 1990)).  We have always emphasized that an *Allen* charge must be "fair, neutral[,] and balanced."  *Cornell*, 780 F.3d at 625.  It must not "coerce one side or

---

[31] The government asserts on appeal that Farrell failed to properly preserve an objection to the trial court's handling of the Jury Note and that we can only review the *Allen* charge contention for plain error.  We are satisfied, however, that Farrell sufficiently preserved the issue and must review it for abuse of discretion.  *See United States v. Burgos*, 55 F.3d 933, 935 (4th Cir. 1995).

the other" of a divided jury "into changing its position for the sake of unanimity." *United States v. Burgos*, 55 F.3d 933, 941 (4th Cir. 1995).

Assuming the Jury Note instruction was in fact an *Allen* charge, we are satisfied that it was not erroneously coercive.[32] Read properly, the instruction avoided "the most egregious mistake" of suggesting that "jurors surrender their conscientious convictions." *See Burgos*, 55 F.3d at 939; *see also Cornell*, 780 F.3d at 626 (explaining that *Allen* charge must be considered in its entirety). Indeed, the trial court emphasized that each juror should follow his or her own conscience. *See United States v. Sawyers*, 423 F.2d 1335, 1340 (4th Cir. 1970) (rejecting challenge to content of *Allen* charge, which emphasized "that no juror should surrender his or her conscientious convictions"). The challenged instruction thus explicitly left open the possibility that the jury could fail to reach a verdict. And the jury acquitted Farrell on two of the charges, supporting the proposition that the verdict came from "a thoughtful and deliberate jury — not one acting under an impulse of coercion." *See Cornell*, 780 F.3d at 627. In these circumstances, the district court did not err in its handling of the Jury Note.

---

[32] As the government emphasizes on appeal, there are solid reasons to question whether the challenged instruction was actually an *Allen* charge. For example, a proper *Allen* charge is given when the jury indicates that it has "reached an impasse." *See Cornell*, 780 F.3d at 625. The Jury Note lacked any such indication.

IV.

Pursuant to the foregoing, we reject Farrell's challenges to his convictions and affirm the criminal judgment.

*AFFIRMED*

THACKER, Circuit Judge, concurring:

I join the well reasoned majority opinion. I write separately to highlight my view that our decision in this case should not be read so broadly to place defense attorneys in legal jeopardy for money laundering simply as a result of their representation of criminal defendants in the normal course.

The record before us is replete with evidence that James Michael Farrell was not merely a defense attorney who accepted payments of legal fees from a client charged with drug trafficking, but, rather, he was a willing participant deeply enmeshed in Matt Nicka's large-scale marijuana trafficking organization. As the majority accurately notes, "Farrell crossed the line and became part of the Nicka Organization itself, as its consigliere and fixer." Ante at 36 (internal quotation marks and alterations omitted). Accordingly, I concur with the majority's conclusion that there is more than sufficient evidence to support Farrell's conviction for conspiracy to commit money laundering.

However, with all due respect to the majority, I do not misapprehend the majority's distinction between a lawyer advising a client involved in ongoing unlawful activities and a lawyer representing persons accused of past wrongdoing. I merely have a difference of opinion as to how broadly this opinion should be read. In my view, a lawyer representing a client charged with drug trafficking generally does not "place[] himself at great personal risk," and is not "circumscribed in the legal advice that can permissibly be provided." Ante at 35. The fair and proper administration of our criminal justice system depends on a defense attorney's ability to effectively advise and represent his or her client without fear of criminal prosecution. Importantly, Farrell's conviction

did not rely on his legal advice, but on his particular -- and, in my view, egregious -- conduct in furtherance of the money laundering conspiracy. And Farrell's conduct in no way reflects the conduct of a criminal defense attorney engaging in zealous representation of his or her client, regardless of the specific legal advice given by that attorney. Accordingly, from my standpoint our decision should be read narrowly and limited to the facts of this case.